# BATES ET AL. *v.* STATE BAR OF ARIZONA

No. 76–316.   Argued January 18, 1977—Decided June 27, 1977

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined, and in Parts I and II of which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed an opinion concurring in part and dissenting in part, *post,* p. 386. POWELL, J., filed an opinion concurring in part and dissenting in part, in which STEWART, J., joined, *post,* p. 389. REHNQUIST, J., filed an opinion dissenting in part, *post,* p. 404.

*William C. Canby, Jr.,* argued the cause for appellants. With him on the briefs was *Melvin L. Wulf.*

*John P. Frank* argued the cause for appellee. With him on the brief was *Orme Lewis.*

*Deputy Solicitor General Friedman* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Bork, Assistant Attorney General Baker,* and *Barry Grossman.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed by *John R. Schmidt* for the Chicago Council of Lawyers; by *Peter H. Schuck* and *Alan B. Morrison* for the Consumers Union of United States, Inc., et al.; and by *Philip L. Goar* for the Mountain Plains Congress of Senior Organizations et al.

Briefs of *amici curiae* urging affirmance were filed by *Justin A. Stanley* and *H. Blair White* for the American Bar Assn.; by *Peter M. Sfikas* for the American Dental Assn.; by *Ellis Lyons, Bennett Boskey,* and *Edward A. Groobert* for the American Optometric Assn.; by *James W. Rankin* and *Donald E. Scott* for the American Veterinary Medical Assn.; by *Alfred L. Scanlan* and *George W. Liebmann* for the Maryland State Bar Assn., Inc., et al.; by *Andrew P. Miller,* Attorney General of Virginia, *Stuart H. Dunn,* Deputy Attorney General, and *John J. Miles,* Assistant Attorney General, for the Virginia State Bar; and by *Roger P. Stokey, pro se.*

Briefs of *amici curiae* were filed by the American Medical Assn.; by *John J. Relihan* and *Martin J. Solomon* for the Arizona Credit Union League, Inc.; by *Edward L. Lascher, Herbert M. Rosenthal,* and *Stuart A. Forsyth* for the State Bar of California; and by *Rufus L. Edmisten,*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

As part of its regulation of the Arizona Bar, the Supreme Court of that State has imposed and enforces a disciplinary rule that restricts advertising by attorneys. This case presents two issues: whether §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2, forbid such state regulation, and whether the operation of the rule violates the First Amendment, made applicable to the States through the Fourteenth.[1]

I

Appellants John R. Bates and Van O'Steen are attorneys licensed to practice law in the State of Arizona.[2] As such, they are members of the appellee, the State Bar of Arizona.[3]

Attorney General of North Carolina, *Andrew A. Vanore, Jr.*, Senior Deputy Attorney General, *Norma S. Harrell*, Associate Attorney General, and *Harry W. McGalliard* for the State Bar of North Carolina.

[1] See *Bigelow* v. *Virginia*, 421 U. S. 809, 811 (1975); *Schneider* v. *State*, 308 U. S. 147, 160 (1939).

[2] Each appellant is a 1972 graduate of Arizona State University College of Law. Mr. Bates was named by the faculty of that law school as the outstanding student of his class; Mr. O'Steen graduated *cum laude*. App. 220–221.

[3] Rule 27 (a) of the Supreme Court of Arizona, 17A Ariz. Rev. Stat. pp. 84–85 (1973), reads in part:

"1. In order to advance the administration of justice according to law, . . . the Supreme Court of Arizona does hereby perpetuate, create and continue under the direction and control of this Court an organization known as the State Bar of Arizona, and all persons now or hereafter licensed in this state to engage in the practice of law shall be members of the State Bar of Arizona in accordance with the rules of this Court. . . ."

.        .        .        .        .

"3. No person shall practice law in this state or hold himself out as one who may practice law in this state unless he is an active member of the state bar."

See Ariz. Const., Art. 3; Ariz. Rev. Stat. §§ 32–201, 32–237, 32–264 (1976). The Arizona Bar, thus, is an integrated one. See *Lathrop* v. *Donohue*, 367 U. S. 820 (1961).

After admission to the bar in 1972, appellants worked as attorneys with the Maricopa County Legal Aid Society. App. 221.

In March 1974, appellants left the Society and opened a law office, which they call a "legal clinic," in Phoenix. Their aim was to provide legal services at modest fees to persons of moderate income who did not qualify for governmental legal aid. *Id.*, at 75. In order to achieve this end, they would accept only routine matters, such as uncontested divorces, uncontested adoptions, simple personal bankruptcies, and changes of name, for which costs could be kept down by extensive use of paralegals, automatic typewriting equipment, and standardized forms and office procedures. More complicated cases, such as contested divorces, would not be accepted. *Id.*, at 97. Because appellants set their prices so as to have a relatively low return on each case they handled, they depended on substantial volume. *Id.*, at 122–123.

After conducting their practice in this manner for two years, appellants concluded that their practice and clinical concept could not survive unless the availability of legal services at low cost was advertised and, in particular, fees were advertised. *Id.*, at 120–123. Consequently, in order to generate the necessary flow of business, that is, "to attract clients," *id.*, at 121; Tr. of Oral Arg. 4, appellants on February 22, 1976, placed an advertisement (reproduced in the Appendix to this opinion, *infra*, at 385) in the Arizona Republic, a daily newspaper of general circulation in the Phoenix metropolitan area. As may be seen, the advertisement stated that appellants were offering "legal services at very reasonable fees," and listed their fees for certain services.[4]

---

[4] The office benefited from an increase in business after the appearance of the advertisement. App. 235–236, 479–480. It is doubtful, however, whether the increase was due solely to the advertisement, for the advertising itself prompted several news stories. *Id.*, at 229. It might be expected, nonetheless, that advertising will increase business. See Hobbs, Lawyer Advertising: A Good Beginning but Not Enough, 62 A. B. A. J. 735,

Appellants concede that the advertisement constituted a clear violation of Disciplinary Rule 2–101 (B), incorporated in Rule 29 (a) of the Supreme Court of Arizona, 17A Ariz. Rev. Stat., p. 26 (Supp. 1976). The disciplinary rule provides in part:

"(B) A lawyer shall not publicize himself, or his partner, or associate, or any other lawyer affiliated with him or his firm, as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in the city or telephone directories or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf." [5]

736 (1976) (lawyer referral service that advertised referred more than 11 times as many clients as one that did not advertise in another city of comparable size).

[5] The remainder of subdivision (B) states exceptions to the general prohibition:

"However, a lawyer recommended by, paid by, or whose legal services are furnished by, a qualified legal assistance organization may authorize or permit or assist such organization to use means of dignified commercial publicity, which does not identify any lawyer by name, to describe the availability or nature of its legal services or legal service benefits. This rule does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name:

"(1) In political advertisements when his professional status is germane to the political campaign or to a political issue.

"(2) In public notices when the name and profession of a lawyer are required or authorized by law or are reasonably pertinent for a purpose other than the attraction of potential clients.

"(3) In routine reports and announcements of a bona fide business, civic, professional, or political organization in which he serves as a director or officer.

"(4) In and on legal documents prepared by him.

"(5) In and on legal textbooks, treatises, and other legal publications, and in dignified advertisements thereof.

"(6) In communications by a qualified legal assistance organization, along with the biographical information permitted under DR 2–102 (A)(6)

Upon the filing of a complaint initiated by the president of the State Bar, App. 350, a hearing was held before a three-member Special Local Administrative Committee, as prescribed by Arizona Supreme Court Rule 33. App. 16. Although the committee took the position that it could not consider an attack on the validity of the rule, it allowed the parties to develop a record on which such a challenge could be based. The committee recommended that each of the appellants be suspended from the practice of law for not less than six months. *Id.*, at 482. Upon further review by the Board of Governors of the State Bar, pursuant to the Supreme Court's Rule 36, the Board recommended only a one-week suspension for each appellant, the weeks to run consecutively. App. 486–487.

Appellants, as permitted by the Supreme Court's Rule 37, then sought review in the Supreme Court of Arizona, arguing, among other things, that the disciplinary rule violated §§ 1 and 2 of the Sherman Act because of its tendency to limit competition, and that the rule infringed their First Amendment rights. The court rejected both claims. *In re Bates,* 113 Ariz. 394, 555 P. 2d 640 (1976). The plurality [6] may have viewed with some skepticism the claim that a restraint on advertising might have an adverse effect on competition.[7] But, even if the rule might otherwise violate the

---

[biographical information that may be listed 'in a reputable law list or legal directory'], directed to a member or beneficiary of such organization."

[6] The plurality opinion represented the views of two of the five justices that compose the Supreme Court of Arizona. Ariz. Const., Art. 6, § 2; Ariz. Rev. Stat. § 12–101 (1956). It is evident, however, that a majority adhered to the plurality's exposition of the law. One opinion, although styled a dissent, stated that the author agreed with the plurality opinion "in all respects" except for the reduction in punishment. One justice, specially concurring, stated that he agreed "with much of the law and many of the comments expressed by the majority." The opinion of the remaining justice is discussed in the text.

[7] But see *United States* v. *Gasoline Retailers Assn.,* 285 F. 2d 688, 691

Act, the plurality concluded that the regulation was exempt from Sherman Act attack because the rule "is an activity of the State of Arizona acting as sovereign." *Id.,* at 397, 555 P. 2d, at 643. The regulation thus was held to be shielded from the Sherman Act by the state-action exemption of *Parker* v. *Brown,* 317 U. S. 341 (1943).

Turning to the First Amendment issue, the plurality noted that restrictions on professional advertising have survived constitutional challenge in the past, citing, along with other cases, *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), and *Semler* v. *Dental Examiners,* 294 U. S. 608 (1935).[8] Although recognizing that *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748 (1976), and *Bigelow* v. *Virginia,* 421 U. S. 809 (1975), held that commercial speech was entitled to certain protection under the First Amendment, the plurality focused on passages in those opinions acknowledging that special considerations might bear on the advertising of professional services by lawyers. See *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S., at 773 n. 25; *id.,* at 773–775 (concurring opinion); *Bigelow* v. *Virginia,* 421 U. S., at 825 n. 10. The plurality apparently was of the view that the older decisions dealing with professional advertising survived these recent cases unscathed, and held that Disciplinary Rule 2–101 (B) passed First Amend-

---

(CA7 1961); cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 221–222 (1940); *United States* v. *National Society of Professional Engineers,* 181 U. S. App. D. C. 41, 555 F. 2d 978 (1977) (ethical prohibition on members of society from submitting competitive bids for engineering services violates Sherman Act).

[8] See also *Head* v. *New Mexico Board,* 374 U. S. 424 (1963). The Court did not resolve a First Amendment issue in any of these cases. The advertising restrictions were upheld in the face of challenges based on due process, equal protection, and interference with interstate commerce. Although the First Amendment issue was raised in *Head,* the Court refused to consider it because it had been neither presented to the state courts nor reserved in the notice of appeal. *Id.,* at 432–433, n. 12.

ment muster.[9] Because the court, in agreement with the Board of Governors, felt that appellants' advertising "was done in good faith to test the constitutionality of DR 2–101 (B)," it reduced the sanction to censure only.[10] 113 Ariz., at 400, 555 P. 2d, at 646.

Of particular interest here is the opinion of Mr. Justice Holohan in dissent. In his view, the case should have been framed in terms of "the right of the public as consumers and citizens to know about the activities of the legal profession," id., at 402, 555 P. 2d, at 648, rather than as one involving merely the regulation of a profession. Observed in this light, he felt that the rule performed a substantial disservice to the public:

> "Obviously the information of what lawyers charge is important for private economic decisions by those in need of legal services. Such information is also helpful, perhaps indispensable, to the formation of an intelligent opinion by the public on how well the legal system is working and whether it should be regulated or even altered. . . . The rule at issue prevents access to such information by the public." Id., at 402–403, 555 P. 2d, at 648–649.

Although the dissenter acknowledged that some types of advertising might cause confusion and deception, he felt that the remedy was to ban that form, rather than all advertising. Thus, despite his "personal dislike of the concept of advertising by attorneys," id., at 402, 555 P. 2d, at 648, he found the ban unconstitutional.

We noted probable jurisdiction. 429 U. S. 813 (1976).

---

[9] Appellants also unsuccessfully challenged the rule on equal protection and vagueness grounds and asserted that the disciplinary procedures violated due process. These contentions are not made here.

[10] MR. JUSTICE REHNQUIST stayed the order of censure pending final determination of the matter by this Court.

## II

### The Sherman Act

In *Parker* v. *Brown,* 317 U. S. 341 (1943), this Court held that the Sherman Act was not intended to apply against certain state action. See also *Olsen* v. *Smith,* 195 U. S. 332, 344–345 (1904). In *Parker* a raisin producer-packer brought suit against California officials challenging a state program designed to restrict competition among growers and thereby to maintain prices in the raisin market. The Court held that the State, "as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." 317 U. S., at 352. Appellee argues, and the Arizona Supreme Court held, that the *Parker* exemption also bars the instant Sherman Act claim. We agree.

Of course, *Parker* v. *Brown* has not been the final word on the matter. In two recent cases the Court has considered the state-action exemption to the Sherman Act and found it inapplicable for one reason or another. *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975); *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579 (1976). *Goldfarb* and *Cantor,* however, are distinguishable, and their reasoning supports our conclusion here.

In *Goldfarb* we held that § 1 of the Sherman Act was violated by the publication of a minimum-fee schedule by a county bar association and by its enforcement by the State Bar. The schedule and its enforcement mechanism operated to create a rigid price floor for services and thus constituted a classic example of price fixing. Both bar associations argued that their activity was shielded by the state-action exemption. This Court concluded that the action was not protected, emphasizing that "we need not inquire further into the state-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent." 421 U. S., at 790. In the instant case, by contrast, the chal-

lenged restraint is the affirmative command of the Arizona Supreme Court under its Rules 27 (a) and 29 (a) and its Disciplinary Rule 2-101 (B). That court is the ultimate body wielding the State's power over the practice of law, see Ariz. Const., Art. 3; *In re Bailey,* 30 Ariz. 407, 248 P. 29 (1926), and, thus, the restraint is "compelled by direction of the State acting as a sovereign." 421 U. S., at 791.[11]

Appellants seek to draw solace from *Cantor.* The defendant in that case, an electric utility, distributed light bulbs to its residential customers without additional charge, including the cost in its state-regulated utility rates. The plaintiff, a retailer who sold light bulbs, brought suit, claiming that the utility was using its monopoly power in the distribution of electricity to restrain competition in the sale of bulbs. The Court held that the utility could not immunize itself from Sherman Act attack by embodying its challenged practices in a tariff approved by a state commission. Since the disciplinary rule at issue here is derived from the Code of Professional Responsibility of the American Bar Association,[12] appellants argue by analogy to *Cantor* that no immunity should result from the bar's success in having the Code adopted by the State. They also assert that the interest embodied in the Sherman Act must prevail over the state

---

[11] We note, moreover, that the Court's opinion in *Goldfarb* concluded with the observation that "[i]n holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions." 421 U. S., at 793. Allowing the instant Sherman Act challenge to the disciplinary rule would have precisely that undesired effect.

[12] Rule 29 (a) of the Supreme Court of Arizona, 17A Ariz. Rev. Stat., p. 26 (Supp. 1976), provides:

"The duties and obligations of members [of the bar] shall be as prescribed by the Code of Professional Responsibility of the American Bar Association, effective November 1, 1970, as amended by this Court." The challenged rule, DR 2-101 (B), is now identical with the present version of the parallel rule, also numbered DR 2-101 (B), of the ABA Code of Professional Responsibility, as amended to August 1976.

interest in regulating the bar. See 428 U. S., at 595. Particularly is this the case, they claim, because the advertising ban is not tailored so as to intrude upon the federal interest to the minimum extent necessary. See *id.*, at 596 n. 34, and 597.

We believe, however, that the context in which *Cantor* arose is critical. First, and most obviously, *Cantor* would have been an entirely different case if the claim had been directed against a public official or public agency, rather than against a private party.[13] Here, the appellants' claims are against the State. The Arizona Supreme Court is the real party in interest; it adopted the rules, and it is the ultimate trier of fact and law in the enforcement process. *In re Wilson*, 106 Ariz. 34, 470 P. 2d 441 (1970). Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the appellee acts as the agent of the court under its continuous supervision.

Second, the Court emphasized in *Cantor* that the State had no independent regulatory interest in the market for light bulbs. 428 U. S., at 584–585; *id.*, at 604–605, 612–614 (concurring opinions). There was no suggestion that the bulb program was justified by flaws in the competitive market or was a response to health or safety concerns. And an exemption for the program was not essential to the State's regulation of electric utilities. In contrast, the regulation of the activities of the bar is at the core of the State's power to protect the public. Indeed, this Court in *Goldfarb* acknowledged that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the

---

[13] Mr. Justice Stevens, in a portion of his opinion in *Cantor* that was joined by Brennan, White, and Marshall, JJ., observed that *Parker* v. *Brown* was a suit against public officials, whereas in *Cantor* the claims were directed against only a private defendant. 428 U. S., at 585–592, 600–601. The dissenters in *Cantor* would have applied the state-action exemption regardless of the identity of the defendants. *Id.*, at 615–617 (Stewart, J., joined by Powell and Rehnquist, JJ.).

primary governmental function of administering justice, and have historically been 'officers of the courts.' " 421 U. S., at 792. See *Cohen* v. *Hurley*, 366 U. S. 117, 123–124 (1961).[14] More specifically, controls over solicitation and advertising by attorneys have long been subject to the State's oversight.[15] Federal interference with a State's traditional regulation of a profession is entirely unlike the intrusion the Court sanctioned in *Cantor*.[16]

Finally, the light-bulb program in *Cantor* was instigated by the utility with only the acquiescence of the state regulatory commission. The State's incorporation of the program into the tariff reflected its conclusion that the utility was authorized to employ the practice if it so desired. See 428 U. S., at 594, and n. 31. The situation now before us is entirely different. The disciplinary rules reflect a clear articulation of the State's policy with regard to professional behavior. Moreover, as the instant case shows, the rules are subject to pointed re-examination by the policymaker—the Arizona Supreme Court—in enforcement proceedings. Our concern that federal policy is being unnecessarily and inappropriately subordinated to state policy is reduced in such a situation; we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active.

---

[14] *Cohen* v. *Hurley*, in other respects, has been overruled. *Spevack* v. *Klein*, 385 U. S. 511 (1967).

[15] The limitation on advertising by attorneys in Arizona seems to have commenced in 1919 with the incorporation by reference of the American Bar Association's 1908 Canons of Professional Ethics into Arizona's statutory law. 1919 Ariz. Sess. Laws, c. 158.

[16] Indeed, our decision today on the Sherman Act issue was presaged in *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S. 748, 770 (1976). We noted there: "Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. Cf. *Parker* v. *Brown*, 317 U. S. 341 (1943)."

We conclude that the Arizona Supreme Court's determination that appellants' Sherman Act claim is barred by the *Parker* v. *Brown* exemption must be affirmed.

## III

### The First Amendment

### A

Last Term, in *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S. 748 (1976), the Court considered the validity under the First Amendment of a Virginia statute declaring that a pharmacist was guilty of "unprofessional conduct" if he advertised prescription drug prices. The pharmacist would then be subject to a monetary penalty or the suspension or revocation of his license. The statute thus effectively prevented the advertising of prescription drug price information. We recognized that the pharmacist who desired to advertise did not wish to report any particularly newsworthy fact or to comment on any cultural, philosophical, or political subject; his desired communication was characterized simply: " 'I will sell you the X prescription drug at the Y price.' " *Id.*, at 761. Nonetheless, we held that commercial speech of that kind was entitled to the protection of the First Amendment.

Our analysis began, *ibid.*, with the observation that our cases long have protected speech even though it is in the form of a paid advertisement, *Buckley* v. *Valeo*, 424 U. S. 1 (1976); *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); in a form that is sold for profit, *Smith* v. *California*, 361 U. S. 147 (1959); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943); or in the form of a solicitation to pay or contribute money, *New York Times Co.* v. *Sullivan, supra; Cantwell* v. *Connecticut*, 310 U. S. 296 (1940). If commercial speech is to be distinguished, it "must be distinguished by its content." 425 U. S., at 761. But a consideration of competing interests reinforced our view that such speech should not be with-

drawn from protection merely because it proposed a mundane commercial transaction. Even though the speaker's interest is largely economic, the Court has protected such speech in certain contexts. See, *e. g., NLRB* v. *Gissel Packing Co.,* 395 U. S. 575 (1969); *Thornhill* v. *Alabama,* 310 U. S. 88 (1940). The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. See *Bigelow* v. *Virginia,* 421 U. S. 809 (1975). And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. See *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568, 603–604 (1967) (Harlan, J., concurring). In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking. 425 U. S., at 761–765.

Arrayed against these substantial interests in the free flow of commercial speech were a number of proffered justifications for the advertising ban. Central among them were claims that the ban was essential to the maintenance of professionalism among licensed pharmacists. It was asserted that advertising would create price competition that might cause the pharmacist to economize at the customer's expense. He might reduce or eliminate the truly professional portions of his services: the maintenance and packaging of drugs so as to assure their effectiveness, and the supplementation on occasion of the prescribing physician's advice as to use. Moreover, it was said, advertising would cause consumers to price-shop, thereby undermining the pharmacist's effort to monitor the drug use of a regular customer so as to ensure that the prescribed drug would not provoke an allergic reaction or be incompatible with another substance the customer was

consuming. Finally, it was argued that advertising would reduce the image of the pharmacist as a skilled and specialized craftsman—an image that was said to attract talent to the profession and to reinforce the good habits of those in it—to that of a mere shopkeeper. *Id.,* at 766–768.

Although acknowledging that the State had a strong interest in maintaining professionalism among pharmacists, this Court concluded that the proffered justifications were inadequate to support the advertising ban. High professional standards were assured in large part by the close regulation to which pharmacists in Virginia were subject. *Id.,* at 768. And we observed that "on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance." *Id.,* at 769. But we noted the presence of a potent alternative to this "highly paternalistic" approach: "That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.,* at 770. The choice between the dangers of suppressing information and the dangers arising from its free flow was seen as precisely the choice "that the First Amendment makes for us." *Ibid.* See also *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 97 (1977).

We have set out this detailed summary of the *Pharmacy* opinion because the conclusion that Arizona's disciplinary rule is violative of the First Amendment might be said to flow *a fortiori* from it. Like the Virginia statutes, the disciplinary rule serves to inhibit the free flow of commercial information and to keep the public in ignorance. Because of the possibility, however, that the differences among professions might bring different constitutional considerations into play, we specifically reserved judgment as to other professions.[17]

---

[17] "We stress that we have considered in this case the regulation of

In the instant case we are confronted with the arguments directed explicitly toward the regulation of advertising by licensed attorneys.

## B

The issue presently before us is a narrow one. First, we need not address the peculiar problems associated with advertising claims relating to the *quality* of legal services. Such claims probably are not susceptible of precise measurement or verification and, under some circumstances, might well be deceptive or misleading to the public, or even false. Appellee does not suggest, nor do we perceive, that appellants' advertisement contained claims, extravagant or otherwise, as to the quality of services. Accordingly, we leave that issue for another day. Second, we also need not resolve the problems associated with in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence—by attorneys or their agents or "runners." Activity of that kind might well pose dangers of overreaching and misrepresentation not encountered in newspaper announcement advertising. Hence, this issue also is not before us. Third, we note that appellee's criticism of advertising by attorneys does not apply with much force to some of the basic factual content of advertising: information as to the attorney's name, address, and telephone number, office hours, and the like. The American Bar Association itself has a provision in its current Code of Professional Responsibility that would allow the disclosure of such information, and more,

commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." 425 U. S., at 773 n. 25 (emphasis in original). See *id.*, at 773–775 (concurring opinion).

in the classified section of the telephone directory. DR 2–102 (A)(6) (1976).[18] We recognize, however, that an advertising diet limited to such spartan fare would provide scant nourishment.

The heart of the dispute before us today is whether lawyers also may constitutionally advertise the *prices* at which

---

[18] The disciplinary rule, after referring to a listing in "a reputable law list," legal directory, or classified section of a telephone company directory, states:

"The published data may include only the following: name, including name of law firm and names of professional associates; addresses and telephone numbers; one or more fields of law in which the lawyer or law firm concentrates, to the extent not prohibited by the authority having jurisdiction under state law over the subject; a statement that practice is limited to one or more fields of law, to the extent not prohibited by the authority having jurisdiction under state law over the subject of limitation of practice by lawyers; a statement that the lawyer or law firm specializes in a particular field of law or law practice, to the extent permitted by the authority having jurisdiction under state law over the subject of specialization by lawyers and in accordance with rules prescribed by that authority; date and place of birth; date and place of admission to the bar of state and federal courts; schools attended, with dates of graduation, degrees, and other scholastic distinctions; public or quasi-public offices; military service; posts of honor; legal authorships; legal teaching positions; memberships, offices, committee assignments, and section memberships in bar associations; memberships and offices in legal fraternities and legal societies; technical and professional licenses; memberships in scientific, technical and professional associations and societies; foreign language ability; names and addresses of references, and, with their consent, names of clients regularly represented; whether credit cards or other credit arrangements are accepted; office and other hours of availability; a statement of legal fees for an initial consultation or the availability upon request of a written schedule of fees or an estimate of the fee to be charged for the specific services; provided, all such published data shall be disseminated only to the extent and in such format and language uniformly applicable to all lawyers, as prescribed by the authority having jurisdiction by state law over the subject. This proviso is not applicable in any state unless and until it is implemented by such authority in that state."

certain routine services will be performed. Numerous justifications are proffered for the restriction of such price advertising. We consider each in turn:

1. *The Adverse Effect on Professionalism.* Appellee places particular emphasis on the adverse effects that it feels price advertising will have on the legal profession. The key to professionalism, it is argued, is the sense of pride that involvement in the discipline generates. It is claimed that price advertising will bring about commercialization, which will undermine the attorney's sense of dignity and self-worth. The hustle of the marketplace will adversely affect the profession's service · orientation, and irreparably damage the delicate balance between the lawyer's need to earn and his obligation selflessly to serve. Advertising is also said to erode the client's trust in his attorney: Once the client perceives that the lawyer is motivated by profit, his confidence that the attorney is acting out of a commitment to the client's welfare is jeopardized. And advertising is said to tarnish the dignified public image of the profession.

We recognize, of course, and commend the spirit of public service with which the profession of law is practiced and to which it is dedicated. The present Members of this Court, licensed attorneys all, could not feel otherwise. And we would have reason to pause if we felt that our decision today would undercut that spirit. But we find the postulated connection between advertising and the erosion of true professionalism to be severely strained. At its core, the argument presumes that attorneys must conceal from themselves and from their clients the real-life fact that lawyers earn their livelihood at the bar. We suspect that few attorneys engage in such self-deception.[19] And rare is the client, moreover,

---

[19] Counsel for the appellee at oral argument readily stated: "We all know that law offices are big businesses, that they may have billion-dollar or million-dollar clients, they're run with computers, and all the rest. And so the argument may be made that to term them noncommercial is sanctimonious humbug." Tr. of Oral Arg. 64.

even one of modest means, who enlists the aid of an attorney with the expectation that his services will be rendered free of charge. See B. Christensen, Lawyers for People of Moderate Means 152–153 (1970). In fact, the American Bar Association advises that an attorney should reach "a clear agreement with his client as to the basis of the fee charges to be made," and that this is to be done "[a]s soon as feasible after a lawyer has been employed." Code of Professional Responsibility EC 2–19 (1976). If the commercial basis of the relationship is to be promptly disclosed on ethical grounds, once the client is in the office, it seems inconsistent to condemn the candid revelation of the same information before he arrives at that office.

Moreover, the assertion that advertising will diminish the attorney's reputation in the community is open to question. Bankers and engineers advertise,[20] and yet these professions

[20] See B. Christensen, Lawyers for People of Moderate Means 151–152 (1970); Note, Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available, 81 Yale L. J. 1181, 1190 (1972). Indeed, it appears that even the medical profession now views the alleged adverse effect of advertising in a somewhat different light from the appellee. A Statement of the Judicial Council of the American Medical Association provides in part:

"Advertising—The *Principles* [*of Medical Ethics*] do not proscribe advertising; they proscribe the solicitation of patients. . . . The public is entitled to know the names of physicians, the type of their practices, the location of their offices, their office hours, and other useful information that will enable people to make a more informed choice of physician.

"The physician may furnish this information through the accepted local media of advertising or communication, which are open to all physicians on like conditions. Office signs, professional cards, dignified announcements, telephone directory listings, and reputable directories are examples of acceptable media for making information available to the public.

"A physician may give biographical and other relevant data for listing in a reputable directory. . . . If the physician, at his option, chooses to supply fee information, the published data may include his charge for a standard office visit or his fee or range of fees for specific types of services, provided disclosure is made of the variable and other pertinent factors

are not regarded as undignified. In fact, it has been suggested that the failure of lawyers to advertise creates public disillusionment with the profession.[21] The absence of advertising may be seen to reflect the profession's failure to reach out and serve the community: Studies reveal that many persons do not obtain counsel even when they perceive a need because of the feared price of services [22] or because of an inability to locate a competent attorney.[23] Indeed, cynicism

---

affecting the amount of the fee specified. The published data may include other relevant facts about the physician, but false, misleading, or deceptive statements or claims should be avoided." 235 J. A. M. A. 2328 (1976).

[21] See M. Freedman, Lawyers' Ethics in an Adversary System 115–116 (1975); Branca & Steinberg, Attorney Fee Schedules and Legal Advertising: The Implications of *Goldfarb*, 24 UCLA L. Rev. 475, 516–517 (1977).

[22] The Report of the Special Committee on the Availability of Legal Services, adopted by the House of Delegates of the American Bar Association, and contained in the ABA's Revised Handbook on Prepaid Legal Services (1972), states, at 26: "We are persuaded that the actual or feared price of such services coupled with a sense of unequal bargaining status is a significant barrier to wider utilization of legal services." See also E. Koos, The Family and The Law 7 (1948) (survey in which 47.6% of working-class families cited cost as the reason for not using a lawyer); P. Murphy & S. Walkowski, Compilation of Reference Materials on Prepaid Legal Services 2–3 (1973) (summarizing study in which 514 of 1,040 respondents gave expected cost as reason for not using a lawyer's services despite a perceived need). There are indications that fear of cost is unrealistic. See Petition of the Board of Governors of the District of Columbia Bar for Amendments to Rule X of the Rules Governing the Bar of the District of Columbia (1976), reprinted in the App. to Brief for United States as *Amicus Curiae* 10a, 24a–25a (reporting study in which middle-class consumers overestimated lawyers' fees by 91% for the drawing of a simple will, 340% for reading and advising on a 2-page installment sales contract, and 123% for 30 minutes of consultation). See also F. Marks, R. Hallauer, & R. Clifton, The Shreveport Plan: An Experiment in the Delivery of Legal Services 50–52 (1974).

[23] The preliminary release of some of the results of a survey conducted by the ABA Special Committee to Survey Legal Needs in collaboration

with·regard to the profession may be created by the fact that it long has publicly eschewed advertising, while condoning the actions of the attorney who structures his social or civic associations so as to provide contacts with potential clients.

It appears that the ban on advertising originated as a rule of etiquette and not as a rule of ethics. Early lawyers in Great Britain viewed the law as a form of public service, rather than as a means of earning a living, and they looked down on "trade" as unseemly. See H. Drinker, Legal Ethics 5, 210–211 (1953).[24] Eventually, the attitude toward advertising fostered by this view evolved into an aspect of the ethics of the profession. *Id.,* at 211. But habit and tradition are not in themselves an adequate answer to a constitutional challenge. In this day, we do not belittle the person who earns his living by the strength of his arm or the force of his mind. Since the belief that lawyers are somehow "above"

---

with the American Bar Foundation reveals that 48.7% strongly agreed and another 30.2% slightly agreed with the statement that people do not go to lawyers because they have no way of knowing which lawyers are competent to handle their particular problems. ABA, Legal Services and the Public, 3 Alternatives 15 (Jan. 1976). See B. Curran & F. Spalding, The Legal Needs of the Public 96 (Preliminary Report 1974) (an earlier report concerning the same survey). Although advertising by itself is not adequate to deal with this problem completely, it can provide some of the information that a consumer needs to make an intelligent selection.

[24] The British view may be changing. An official British Commission recently presented reports to Parliament recommending that solicitors be permitted to advertise. Monopolies and Mergers Commission, Services of Solicitors in England and Wales: A Report on the Supply of Services of Solicitors in England and Wales in Relation to Restrictions on Advertising 39–41 (1976); Monopolies and Mergers Commission, Services of Solicitors in Scotland: A Report on the Supply of Services of Solicitors in Scotland in Relation to Restrictions on Advertising 31–34 (1976). A companion study concerning barristers recommended that no changes be made in the restrictions upon their advertising, chiefly because barristers are not hired directly by laymen. Monopolies and Mergers Commission, Barristers' Services: A Report on the Supply of Barristers' Services in Relation to Restrictions on Advertising 21–24 (1976).

trade has become an anachronism, the historical foundation for the advertising restraint has crumbled.

2. *The Inherently Misleading Nature of Attorney Advertising.* It is argued that advertising of legal services inevitably will be misleading (a) because such services are so individualized with regard to content and quality as to prevent informed comparison on the basis of an advertisement, (b) because the consumer of legal services is unable to determine in advance just what services he needs, and (c) because advertising by attorneys will highlight irrelevant factors and fail to show the relevant factor of skill.

We are not persuaded that restrained professional advertising by lawyers inevitably will be misleading. Although many services performed by attorneys are indeed unique, it is doubtful that any attorney would or could advertise fixed prices for services of that type.[25]   The only services that lend themselves to advertising are the routine ones: the uncontested divorce, the simple adoption, the uncontested personal bankruptcy, the change of name, and the like—the very services advertised by appellants.[26]   Although the precise service demanded in each task may vary slightly, and although legal services are not fungible, these facts do not make advertising

[25] See Morgan, The Evolving Concept of Professional Responsibility, 90 Harv. L. Rev. 702, 741 (1977); Note, Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available, 81 Yale L. J. 1181, 1203 (1972). Economic considerations suggest that advertising is a more significant force in the marketing of inexpensive and frequently used goods and services with mass markets than in the marketing of unique products or services.

[26] Moreover, we see nothing that is misleading in the advertisement of the cost of an initial half-hour consultation. The American Bar Association's Code of Professional Responsibility DR 2–102 (A)(6) (1976), permits the disclosure of such fee information in the classified section of a telephone directory. See n. 18, *supra.* If the information is not misleading when published in a telephone directory, it is difficult to see why it becomes misleading when published in a newspaper.

misleading so long as the attorney does the necessary work at the advertised price.[27] The argument that legal services are so unique that fixed rates cannot meaningfully be established is refuted by the record in this case: The appellee State Bar itself sponsors a Legal Services Program in which the participating attorneys agree to perform services like those advertised by the appellants at standardized rates. App. 459–478. Indeed, until the decision of this Court in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), the Maricopa County Bar Association apparently had a schedule of suggested minimum fees for standard legal tasks. App. 355. We thus find of little force the assertion that advertising is misleading because of an inherent lack of standardization in legal services.[28]

The second component of the argument—that adver-

---

[27] One commentator has observed: "[A] moment's reflection reveals that the same argument can be made for barbers; rarely are two haircuts identical, but that does not mean that barbers cannot quote a standard price. Lawyers perform countless relatively standardized services which vary somewhat in complexity but not so much as to make each job utterly unique." Morgan, *supra*, n. 25, at 714.

[28] THE CHIEF JUSTICE and MR. JUSTICE POWELL argue in dissent that advertising will be misleading because the exact services that are included in an advertised package may not be clearly specified or understood by the prospective client. *Post*, at 386–387 and 392–394. The bar, however, retains the power to define the services that must be included in an advertised package, such as an uncontested divorce, thereby standardizing the "product." We recognize that an occasional client might fail to appreciate the complexity of his legal problem and will visit an attorney in the mistaken belief that his difficulty can be handled at the advertised price. The misunderstanding, however, usually will be exposed at the initial consultation, and an ethical attorney would impose, at the most, a minimal consultation charge or no charge at all for the discussion. If the client decides to have work performed, a fee could be negotiated in the normal manner. The client is thus in largely the same position as he would be if there were no advertising. In light of the benefits of advertising to those whose problem can be resolved at the advertised price, suppression is not warranted on account of the occasional client who misperceives his legal difficulties.

tising ignores the diagnostic role—fares little better.[29]  It is unlikely that many people go to an attorney merely to ascertain if they have a clean bill of legal health.  Rather, attorneys are likely to be employed to perform specific tasks.  Although the client may not know the detail involved in performing the task, he no doubt is able to identify the service he desires at the level of generality to which advertising lends itself.

The third component is not without merit: Advertising does not provide a complete foundation on which to select an attorney.  But it seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision.  The alternative—the prohibition of advertising—serves only to restrict the information that flows to consumers.[30]  Moreover, the argument assumes that the public

---

[29] The same argument could be made about the advertising of abortion services.  Although the layman may not know all the details of the medical procedure and may not always be able accurately to diagnose pregnancy, such advertising has certain First Amendment protection.  *Bigelow* v. *Virginia*, 421 U. S. 809 (1975).

[30] It might be argued that advertising is undesirable because it allows the potential client to substitute advertising for reputational information in selecting an appropriate attorney.  See, *e. g.*, Note, Sherman Act Scrutiny of Bar Restraints on Advertising and Solicitation by Attorneys, 62 Va. L. Rev. 1135, 1152–1157 (1976).  Since in a referral system relying on reputation an attorney's future business is partially dependent on current performance, such a system has the benefit both of providing a mechanism for disciplining misconduct and of creating an incentive for an attorney to do a better job for his present clients.  Although the system may have worked when the typical lawyer practiced in a small, homogeneous community in which ascertaining reputational information was easy for a consumer, commentators have seriously questioned its current efficacy.  See, *e. g.*, B. Christensen, Lawyers for People of Moderate Means 128–135 (1970); Note, Bar Restrictions on Dissemination of Information about Legal Services, 22 UCLA L. Rev. 483, 500 (1974); Note, Sherman Act Scrutiny, *supra*, at 1156–1157.  The trends of urbanization and specialization long since have moved the typical practice of law from its small-

is not sophisticated enough to realize the limitations of advertising, and that the public is better kept in ignorance than trusted with correct but incomplete information. We suspect the argument rests on an underestimation of the public. In any event, we view as dubious any justification that is based on the benefits of public ignorance. See *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S., at 769–770. Although, of course, the bar retains the power to correct omissions that have the effect of presenting an inaccurate picture, the preferred remedy is more disclosure, rather than less. If the naiveté of the public will cause advertising by attorneys to be misleading, then it is the bar's role to assure that the populace is sufficiently informed as to enable it to place advertising in its proper perspective.

3. *The Adverse Effect on the Administration of Justice.* Advertising is said to have the undesirable effect of stirring up litigation.[31] The judicial machinery is designed to serve those who feel sufficiently aggrieved to bring forward their claims. Advertising, it is argued, serves to encourage the assertion of legal rights in the courts, thereby undesirably unsettling

---

town setting. See R. Pound, The Lawyer from Antiquity to Modern Times 242 (1953). Information as to the qualifications of lawyers is not available to many. See n. 23, *supra*. And, if available, it may be inaccurate or biased. See Note, Sherman Act Scrutiny, *supra*, at 1157.

[31] It is argued that advertising also will encourage fraudulent claims. We do not believe, however, that there is an inevitable relationship between advertising and dishonesty. See Monopolies and Mergers Commission, Services of Solicitors in England and Wales, *supra*, n. 24, at 32–33 ("The temptation to depart from the high standards required of the profession no doubt exists, but we do not believe that solicitors would be likely to succumb to it more easily or more frequently merely by reason of the supposed contamination of advertising; the traditions of the profession and the sense of responsibility of its members are in our view too strong for this to happen"). Unethical lawyers and dishonest laymen are likely to meet even though restrictions on advertising exist. The appropriate response to fraud is a sanction addressed to that problem alone, not a sanction that unduly burdens a legitimate activity.

societal repose. There is even a suggestion of barratry. See, e. g., Comment, A Critical Analysis of Rules Against Solicitation by Lawyers, 25 U. Chi. L. Rev. 674, 675–676 (1958).

But advertising by attorneys is not an unmitigated source of harm to the administration of justice. It may offer great benefits. Although advertising might increase the use of the judicial machinery, we cannot accept the notion that it is always better for a person to suffer a wrong silently than to redress it by legal action.[32] As the bar acknowledges, "the middle 70% of our population is not being reached or served adequately by the legal profession." ABA, Revised Handbook on Prepaid Legal Services 2 (1972).[33] Among the reasons for this underutilization is fear of the cost, and an inability to locate a suitable lawyer. See nn. 22 and 23, *supra.* Advertising can help to solve this acknowledged problem: Advertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange. The disciplinary rule at issue likely has served to burden access to legal services, par-

[32] Decided cases reinforce this view. The Court often has recognized that collective activity undertaken to obtain meaningful access to the courts is protected under the First Amendment. See *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 585 (1971); *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217, 222–224 (1967); *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1, 7 (1964); *NAACP* v. *Button,* 371 U. S. 415, 438–440 (1963). It would be difficult to understand these cases if a lawsuit were somehow viewed as an evil in itself. Underlying them was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much force to aggrieved individuals as it does to groups.

[33] The ABA survey discussed in n. 23 indicates that 35.8% of the adult population has never visited an attorney and another 27.9% has visited an attorney only once. 3 Alternatives, *supra,* n. 23, at 12. See also P. Murphy & S. Walkowski, Compilation of Reference Materials on Prepaid Legal Services 1 (1973); Meserve, Our Forgotten Client: The Average American, 57 A. B. A. J. 1092 (1971). Appellee concedes the existence of the problem, but argues that advertising offers an unfortunate solution. Brief for Appellee 54–56.

ticularly for the not-quite-poor and the unknowledgeable. A rule allowing restrained advertising would be in accord with the bar's obligation to "facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available." ABA Code of Professional Responsibility EC 2–1 (1976).

4. *The Undesirable Economic Effects of Advertising.* It is claimed that advertising will increase the overhead costs of the profession, and that these costs then will be passed along to consumers in the form of increased fees. Moreover, it is claimed that the additional cost of practice will create a substantial entry barrier, deterring or preventing young attorneys from penetrating the market and entrenching the position of the bar's established members.

These two arguments seem dubious at best. Neither distinguishes lawyers from others, see *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U. S., at 768, and neither appears relevant to the First Amendment. The ban on advertising serves to increase the difficulty of discovering the lowest cost seller of acceptable ability. As a result, to this extent attorneys are isolated from competition, and the incentive to price competitively is reduced. Although it is true that the effect of advertising on the price of services has not been demonstrated, there is revealing evidence with regard to products; where consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertising.[34] It is entirely possible that advertising will serve to reduce, not advance, the cost of legal services to the consumer.[35]

---

[34] See Benham, The Effect of Advertising on the Price of Eyeglasses, 15 J. Law & Econ. 337 (1972); J. Cady, Restricted Advertising and Competition: The Case of Retail Drugs (1976). See also *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U. S., at 754, and n. 11 (noting variation in drug prices of up to 1200% in one city).

[35] On the one hand, advertising does increase an attorney's overhead costs, and, in light of the underutilization of legal services by the public,

The entry-barrier argument is equally unpersuasive. In the absence of advertising, an attorney must rely on his contacts with the community to generate a flow of business. In view of the time necessary to develop such contacts, the ban in fact serves to perpetuate the market position of established attorneys. Consideration of entry-barrier problems would urge that advertising be allowed so as to aid the new competitor in penetrating the market.

5. *The Adverse Effect of Advertising on the Quality of Service.* It is argued that the attorney may advertise a given "package" of service at a set price, and will be inclined to provide, by indiscriminate use, the standard package regardless of whether it fits the client's needs.

Restraints on advertising, however, are an ineffective way of deterring shoddy work. An attorney who is inclined to cut quality will do so regardless of the rule on advertising. And the advertisement of a standardized fee does not necessarily mean that the services offered are undesirably standardized. Indeed, the assertion that an attorney who advertises a standard fee will cut quality is substantially undermined by the fixed-fee schedule of appellee's own prepaid Legal Services Program. Even if advertising leads to the

see n. 33, *supra,* it may increase substantially the demand for services. Both these factors will tend to increase the price of legal services. On the other hand, the tendency of advertising to enhance competition might be expected to produce pressures on attorneys to reduce fees. The net effect of these competing influences is hard to estimate. We deem it significant, however, that consumer organizations have filed briefs as *amici* urging that the restriction on advertising be lifted. And we note as well that, despite the fact that advertising on occasion might increase the price the consumer must pay, competition through advertising is ordinarily the desired norm.

Even if advertising causes fees to drop, it is by no means clear that a loss of income to lawyers will result. The increased volume of business generated by advertising might more than compensate for the reduced profit per case. See Frierson, Legal Advertising, Barrister 6, 8 (Winter 1975); Wilson, Madison Avenue, Meet the Bar, 61 A. B. A. J. 586, 588 (1975).

creation of "legal clinics" like that of appellants'—clinics that emphasize standardized procedures for routine problems—it is possible that such clinics will improve service by reducing the likelihood of error.

6. *The Difficulties of Enforcement.* Finally, it is argued that the wholesale restriction is justified by the problems of enforcement if any other course is taken. Because the public lacks sophistication in legal matters, it may be particularly susceptible to misleading or deceptive advertising by lawyers. After-the-fact action by the consumer lured by such advertising may not provide a realistic restraint because of the inability of the layman to assess whether the service he has received meets professional standards. Thus, the vigilance of a regulatory agency will be required. But because of the numerous purveyors of services, the overseeing of advertising will be burdensome.

It is at least somewhat incongruous for the opponents of advertising to extol the virtues and altruism of the legal profession at one point, and, at another, to assert that its members will seize the opportunity to mislead and distort. We suspect that, with advertising, most lawyers will behave as they always have: They will abide by their solemn oaths to uphold the integrity and honor of their profession and of the legal system. For every attorney who overreaches through advertising, there will be thousands of others who will be candid and honest and straightforward. And, of course, it will be in the latter's interest, as in other cases of misconduct at the bar, to assist in weeding out those few who abuse their trust.

In sum, we are not persuaded that any of the proffered justifications rise to the level of an acceptable reason for the suppression of all advertising by attorneys.

## C

In the usual case involving a restraint on speech, a showing that the challenged rule served unconstitutionally to suppress

speech would end our analysis. In the First Amendment context, the Court has permitted attacks on overly broad statutes without requiring that the person making the attack demonstrate that in fact his specific conduct was protected. See, *e. g., Bigelow* v. *Virginia,* 421 U. S., at 815–816; *Gooding* v. *Wilson,* 405 U. S. 518, 521–522 (1972); *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965). Having shown that the disciplinary rule interferes with protected speech, appellants ordinarily could expect to benefit regardless of the nature of their acts.

The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. See, *e. g., Broadrick* v. *Oklahoma,* 413 U. S. 601, 610 (1973); *United States* v. *Raines,* 362 U. S. 17, 21 (1960); *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). The reason for the special rule in First Amendment cases is apparent: An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. See *NAACP* v. *Button,* 371 U. S. 415, 433 (1963). Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.

But the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged in *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S., at 771 n. 24, there

are "commonsense differences" between commercial speech and other varieties. See also *id.*, at 775–781 (concurring opinion). Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. See *id.*, at 771–772, n. 24. Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service that he provides, and presumably he can determine more readily than others whether his speech is truthful and protected. *Ibid.* Since overbreadth has been described by this Court as "strong medicine," which "has been employed . . . sparingly and only as a last resort," *Broadrick* v. *Oklahoma,* 413 U. S., at 613, we decline to apply it to professional advertising, a context where it is not necessary to further its intended objective. Cf. *Bigelow* v. *Virginia,* 421 U. S., at 817–818.

Is, then, appellants' advertisement outside the scope of basic First Amendment protection? Aside from general claims as to the undesirability of any advertising by attorneys, a matter considered above, appellee argues that appellants' advertisement is misleading, and hence unprotected, in three particulars: (a) the advertisement makes reference to a "legal clinic," an allegedly undefined term; (b) the advertisement claims that appellants offer services at "very reasonable" prices, and, at least with regard to an uncontested divorce, the advertised price is not a bargain; and (c) the advertisement does not inform the consumer that he may obtain a name change without the services of an attorney. Tr. of Oral Arg. 56–57. On this record, these assertions are unpersuasive. We suspect that the public would readily understand the term "legal clinic"—if, indeed, it focused on the term at all—to refer to an operation like that of appellants' that is geared to provide standardized and multiple services. In fact, in his deposition the president of the State Bar of Arizona observed

that there was a committee of the bar "exploring the ways in which the legal clinic concept can be properly developed." App. 375; see *id.*, at 401. See also *id.*, at 84–85 (testimony of appellants). And the clinical concept in the sister profession of medicine surely by now is publicly acknowledged and understood.

As to the cost of an uncontested divorce, appellee's counsel stated at oral argument that this runs from $150 to $300 in the area. Tr. of Oral Arg. 58. Appellants advertised a fee of $175 plus a $20 court filing fee, a rate that seems "very reasonable" in light of the customary charge. Appellee's own Legal Services Program sets the rate for an uncontested divorce at $250. App. 473. Of course, advertising will permit the comparison of rates among competitors, thus revealing if the rates are reasonable.

As to the final argument—the failure to disclose that a name change might be accomplished by the client without the aid of an attorney—we need only note that most legal services may be performed legally by the citizen for himself. See *Faretta* v. *California,* 422 U. S. 806 (1975); ABA Code of Professional Responsibility EC 3–7 (1976). The record does not unambiguously reveal some of the relevant facts in determining whether the nondisclosure is misleading, such as how complicated the procedure is and whether the State provides assistance for laymen. The deposition of one appellant, however, reflects that when he ascertained that a name change required only the correction of a record or the like, he frequently would send the client to effect the change himself.[36] App. 112.

We conclude that it has not been demonstrated that the advertisement at issue could be suppressed.

---

[36] The same appellant, however, stated: "[I]t's not my job to inform a prospective client that he needn't employ a lawyer to handle his work." App. 112–113.

## IV

In holding that advertising by attorneys may not be subjected to blanket suppression, and that the advertisement at issue is protected, we, of course, do not hold that advertising by attorneys may not be regulated in any way. We mention some of the clearly permissible limitations on advertising not foreclosed by our holding.

Advertising that is false, deceptive, or misleading of course is subject to restraint. See *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S., at 771–772, and n. 24. Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. *Id.,* at 771–772, n. 24. And any concern that strict requirements for truthfulness will undesirably inhibit spontaneity seems inapplicable because commercial speech generally is calculated. Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena. Compare *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 339–341 (1974), and *Cantwell* v. *Connecticut,* 310 U. S., at 310, with *NLRB* v. *Gissel Packing Co.,* 395 U. S., at 618. In fact, because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising.[37] For example, advertising claims as to the quality of services—a matter we do not address today—are not susceptible of measurement or verification; accordingly, such claims may be so likely to be

---

[37] The determination whether an advertisement is misleading requires consideration of the legal sophistication of its audience. Cf. *Feil* v. *FTC,* 285 F. 2d 879, 897 (CA9 1960). Thus, different degrees of regulation may be appropriate in different areas.

misleading as to warrant restriction. Similar objections might justify restraints on in-person solicitation. We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to assure that the consumer is not misled. In sum, we recognize that many of the problems in defining the boundary between deceptive and nondeceptive advertising remain to be resolved, and we expect that the bar will have a special role to play in assuring that advertising by attorneys flows both freely and cleanly.

As with other varieties of speech, it follows as well that there may be reasonable restrictions on the time, place, and manner of advertising. See *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S., at 771. Advertising concerning transactions that are themselves illegal obviously may be suppressed. See *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 388 (1973). And the special problems of advertising on the electronic broadcast media will warrant special consideration. Cf. *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582 (DC 1971), summarily aff'd *sub nom. Capital Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972).

The constitutional issue in this case is only whether the State may prevent the publication in a newspaper of appellants' truthful advertisement concerning the availability and terms of routine legal services. We rule simply that the flow of such information may not be restrained, and we therefore hold the present application of the disciplinary rule against appellants to be violative of the First Amendment.

The judgment of the Supreme Court of Arizona is therefore affirmed in part and reversed in part.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT

ADVERTISEMENT

# *DO YOU NEED A LAWYER?*

## *LEGAL SERVICES*
## *AT VERY REASONABLE FEES*

° Divorce or legal separation--uncontested
[both spouses sign papers]

$175.00 plus $20.00 court filing fee

° Preparation of all court papers and instructions on how to do your own simple uncontested divorce

$100.00

° Adoption--uncontested severance proceeding

$225.00 plus approximately $10.00 publication cost

° Bankruptcy--non-business, no contested proceedings

Individual
$250.00 plus $55 00 court filing fee

Wife and Husband
$300.00 plus $110.00 court filing fee

° Change of Name

$95.00 plus $20.00 court filing fee

Information regarding other types of cases furnished on request

## Legal Clinic of Bates & O'Steen

617 North 3rd Street
Phoenix, Arizona 85004
Telephone [602] 252-8888

Mr. Chief Justice Burger, concurring in part and dissenting in part.

I am in general agreement with Mr. Justice Powell's analysis and with Part II of the Court's opinion. I particularly agree with Mr. Justice Powell's statement that "today's decision will effect profound changes in the practice of law." *Post*, at 389. Although the exact effect of those changes cannot now be known, I fear that they will be injurious to those whom the ban on legal advertising was designed to protect—the members of the general public in need of legal services.

Some Members of the Court apparently believe that the present case is controlled by our holding one year ago in *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S. 748 (1976). However, I had thought that we made most explicit that our holding there rested on the fact that the advertisement of standardized, prepackaged, name-brand drugs was at issue. *Id.*, at 773 n. 25. In that context, the prohibition on price advertising, which had served a useful function in the days of individually compounded medicines, was no longer tied to the conditions which had given it birth. The same cannot be said with respect to legal services which, by necessity, must vary greatly from case to case. Indeed, I find it difficult, if not impossible, to identify categories of legal problems or services which are fungible in nature. For example, Mr. Justice Powell persuasively demonstrates the fallacy of any notion that even an uncontested divorce can be "standard." *Post*, at 392–394. A "reasonable charge" for such a divorce could be $195, as the appellants wish to advertise, or it could reasonably be a great deal more, depending on such variables as child custody, alimony, support, or any property settlement. Because legal services can rarely, if ever, be "standardized" and because potential clients rarely know in advance what services they do in fact need, price advertising can never give the public an accurate picture on which to base its selection of an attorney. Indeed, in the context of legal

services, such incomplete information could be worse than no information at all.[1]   It could become a trap for the unwary.

The Court's opinion largely disregards these facts on the unsupported assumptions that attorneys will not advertise anything but "routine" services—which the Court totally fails to identify or define—or, if they do advertise, that the bar and the courts will be able to protect the public from those few practitioners who abuse their trust.   The former notion is highly speculative and, of course, does nothing to solve the problems that this decision will create; as to the latter, the existing administrative machinery of both the profession and the courts has proved wholly inadequate to police the profession effectively.   See ABA Special Committee On Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (1970).   To impose the enormous new regulatory burdens called for by the Court's decision on the presently deficient machinery of the bar and courts is unrealistic; it is almost predictable that it will create problems of unmanageable proportions.   The Court thus takes a "great leap" into an unexplored, sensitive regulatory area where the legal profession and the courts have not yet learned to crawl, let alone stand up or walk.   In my view, there is no need for this hasty plunge into a problem where not even the wisest of experts—if such experts exist—can move with sure steps.

---

[1] I express no view on MR. JUSTICE POWELL's conclusion that the advertisement of an attorney's initial consultation fee or his hourly rate would not be inherently misleading and thus should be permitted since I cannot understand why an "initial consultation" should have a different charge base from an hourly rate. *Post*, at 399–400.   Careful study of the problems of attorney advertising—and none has yet been made—may well reveal that advertisements limited to such matters do not carry with them the potential for abuse that accompanies the advertisement of fees for particular services.   However, even such limited advertisements should not be permitted without a disclaimer which informs the public that the fee charged in any particular case will depend on and vary according to the individual circumstances of that case.   See ABA Code of Professional Responsibility DR 2–106 (B) (1976).

To be sure, the public needs information concerning attorneys, their work, and their fees. At the same time, the public needs protection from the unscrupulous or the incompetent practitioner anxious to prey on the uninformed. It seems to me that these twin goals can best be served by permitting the organized bar to experiment with and perfect programs which would announce to the public the probable *range* of fees for specifically defined services and thus give putative clients some idea of potential cost liability when seeking out legal assistance.[2] However, even such programs should be confined to the known and knowable, *e. g.*, the truly "routine" uncontested divorce which is defined to exclude any dispute over alimony, property rights, child custody or support, and should make clear to the public that the actual fee charged in any given case will vary according to the individual circumstances involved, see ABA Code of Professional Responsibility DR 2–106 (B) (1976), in order to insure that the expectations of clients are not unduly inflated. Accompanying any reform of this nature must be some type of *effective* administrative procedure to hear and resolve the grievances and complaints of disappointed clients.

Unfortunately, the legal profession in the past has approached solutions for the protection of the public with too much caution, and, as a result, too little progress has been made. However, as MR. JUSTICE POWELL points out, *post*, at 398–399, the organized bar has recently made some reforms in this sensitive area and more appear to be in the offing. Rather than allowing these efforts to bear fruit, the Court today opts for a Draconian "solution" which I believe will only breed more problems than it can conceivably resolve.

---

[2] The publication of such information by the organized bar would create no conflict with our holding in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), so long as attorneys were under no obligation to charge within the range of fees described.

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

I agree with the Court that appellants' Sherman Act claim is barred by the *Parker* v. *Brown,* 317 U. S. 341 (1943), exemption and therefore join Part II of the Court's opinion. But I cannot join the Court's holding that under the First Amendment "truthful" newspaper advertising of a lawyer's prices for "routine legal services" may not be restrained. *Ante,* at 384. Although the Court appears to note some reservations (mentioned below), it is clear that within undefined limits today's decision will effect profound changes in the practice of law, viewed for centuries as a learned profession. The supervisory power of the courts over members of the bar, as officers of the courts, and the authority of the respective States to oversee the regulation of the profession have been weakened. Although the Court's opinion professes to be framed narrowly, and its reach is subject to future clarification, the holding is explicit and expansive with respect to the advertising of undefined "routine legal services." In my view, this result is neither required by the First Amendment, nor in the public interest.

I

Appellants, two young members of the Arizona Bar, placed an advertisement in a Phoenix newspaper apparently for the purpose of testing the validity of Arizona's ban on advertising by attorneys. The advertisement, reproduced *ante,* at 385, stated that appellants' "Legal Clinic" provided "legal services at very reasonable fees," and identified the following four legal services, indicating an exact price for each:

(1) Divorce or legal separation—uncontested (both spouses sign papers): $175 plus $20 court filing fee.

(2) Preparation of all court papers and instructions on how to do your own simple uncontested divorce: $100.

(3) Adoption—uncontested severance proceeding: $225 plus approximately $10 publication cost.

(4) Bankruptcy—non-business, no contested proceedings—individual: $250 plus $55 court filing fee; wife and husband: $300 plus $110 court filing fee.

(5) Change of Name—$95 plus $20 court filing fee.

The advertisement also stated that information regarding other types of cases would be furnished on request. Since it is conceded that this advertisement violated Disciplinary Rule 2–101 (B), incorporated in Rule 29 (a) of the Supreme Court of Arizona,[1] the question before us is whether the application of the disciplinary rule to appellants' advertisement violates the First Amendment.

The Court finds the resolution of that question in our recent decision in *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748 (1976). In that case, we held unconstitutional under the First and Fourteenth Amendments a Virginia statute declaring it unprofessional conduct for a licensed pharmacist to advertise the prices of prescription drugs. We concluded that commercial speech to the effect that "I will sell you the X prescription drug at the Y price" was entitled to certain protection under the First Amendment, and found that the proffered justifications were inadequate to support the ban on price advertising. But we were careful to note that we were dealing in that case with price advertising of a *standardized product.* The Court specifically reserved judgment as to the constitutionality of state regulation of price advertising with respect to *professional services:*

"We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense

---

[1] The disciplinary rule is reproduced *ante,* at 355, and n. 5.

standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." *Id.,* at 773 n. 25 (emphasis in original).[2]

This case presents the issue so reserved, and the Court resolves it on the assumption that what it calls "routine" legal services are essentially no different for purposes of First Amendment analysis from prepackaged prescription drugs. In so holding, the Court fails to give appropriate weight to the two fundamental ways in which the advertising of professional services presents a different issue from that before the Court with respect to tangible products: the vastly increased potential for deception and the enhanced difficulty of effective regulation in the public interest.

A

It has long been thought that price advertising of legal services inevitably will be misleading because such services are individualized with respect to content and quality and because the lay consumer of legal services usually does not know in advance the precise nature and scope of the services he requires. *Ante,* at 372. Although the Court finds some force in this reasoning and recognizes that "many services performed by attorneys are indeed unique," its first answer is the optimistic expression of hope that few lawyers "would or could advertise fixed prices for services of that type." *Ibid.* But the Court's basic response in view of the acknowledged potential for deceptive advertising of "unique" services is to divide the immense range of the professional product of

---

[2] THE CHIEF JUSTICE, concurring in *Virginia Pharmacy,* also emphasized the distinction between tangible products and professional services:

"The Court notes that roughly 95% of all prescriptions are filled with dosage units already prepared by the manufacturer and sold to the pharmacy in that form. . . . In dispensing these *prepackaged* items, the pharmacist performs largely a packaging rather than a compounding function of former times." 425 U. S., at 773–774 (emphasis in original).

lawyers into two categories: "unique" and "routine." The only insight afforded by the opinion as to how one draws this line is the finding that services similar to those in appellants' advertisement are routine: "the uncontested divorce, the simple adoption, the uncontested personal bankruptcy, the change of name, and the like." *Ibid.* What the phrase "the like" embraces is not indicated. But the advertising of such services must, in the Court's words, flow "both freely and cleanly." *Ante,* at 384.

Even the briefest reflection on the tasks for which lawyers are trained and the variation among the services they perform should caution against facile assumptions that legal services can be classified into the routine and the unique. In most situations it is impossible—both for the client and the lawyer—to identify with reasonable accuracy in advance the nature and scope of problems that may be encountered even when handling a matter that at the outset seems routine. Neither quantitative nor qualitative measurement of the service actually needed is likely to be feasible in advance.[3]

This definitional problem is well illustrated by appellants' advertised willingness to obtain uncontested divorces for $195 each. A potential client can be grievously misled if he

---

[3] What legal services are "routine" depends on the eye of the beholder. A particular service may be quite routine to a lawyer who has specialized in that area for many years. The marital trust provisions of a will, for example, are routine to the experienced tax and estate lawyer; they may be wholly alien to the negligence litigation lawyer. And what the unsophisticated client may think is routine simply cannot be predicted. Absent even a minimal common understanding as to the service, and given the unpredictability in advance of what actually may be required, the advertising lawyer and prospective client often will have no meeting of the minds. Although widely advertised tangible products customarily vary in many respects, at least in the vast majority of cases prospective purchasers know the product and can make a preliminary comparative judgment based on price. But not even the lawyer doing the advertising can know in advance the nature and extent of services required by the client who responds to the advertisement. Price comparisons of designated services, therefore, are more likely to mislead than to inform.

reads the advertised service as embracing all of his possible needs. A host of problems are implicated by divorce. They include alimony; support and maintenance for children; child custody; visitation rights; interests in life insurance, community property, tax refunds, and tax liabilities; and the disposition of other property rights.[4] The processing of court papers—apparently the only service appellants provide for $100—is usually the most straightforward and least demanding aspect of the lawyer's responsibility in a divorce case. More important from the viewpoint of the client is the diagnostic and advisory function: the pursuit of relevant inquiries of which the client would otherwise be unaware, and advice with respect to alternative arrangements that might prevent irreparable dissolution of the marriage or otherwise resolve the client's problem.[5] Although those profes-

---

[4] It may be argued that many of these problems are not applicable for couples of modest means. This is by no means invariably true, even with respect to alimony, support and maintenance, and property questions. And it certainly is not true with respect to the more sensitive problems of child custody and visitation rights.

[5] A high percentage of couples seeking counsel as to divorce desire initially that it be uncontested. They often describe themselves as civilized people who have mutually agreed to separate; they want a quiet, out-of-court divorce without alimony. But experienced counsel knows that the initial spirit of amity often fades quickly when the collateral problems are carefully explored. Indeed, scrupulous counsel— except in the rare case—will insist that the parties have separate counsel to assure that the rights of each, and those of children, are protected adequately. In short, until the lawyer has performed his first duties of diagnosis and advice as to rights, it is usually impossible to know whether there can or will be an uncontested divorce. As President Mark Harrison of the State Bar of Arizona testified:

"I suppose you can get lucky and have three clients come in in response to [appellants' advertisement] who have no children; no real property; no real disagreement, and you can handle such an uncontested divorce, and do a proper job for a [pre]determined, . . . prestated price.

"[T]he inherent vice [is] that you can't know in advance, what special

sional functions are not included within appellants' packaged routine divorce, they frequently fall within the concept of "advice" with which the lay person properly is concerned when he or she seeks legal counsel. The average lay person simply has no feeling for which services are included in the packaged divorce, and thus no capacity to judge the nature of the advertised product.[6] As a result, the type of advertisement before us inescapably will mislead many who respond to it. In the end, it will promote distrust of lawyers and disrespect for our own system of justice.

The advertising of specified services at a fixed price is not the only infirmity of the advertisement at issue.[7] Appellants also assert that these services are offered at "very reasonable fees." That Court finds this to be an accurate statement since the advertised fee fell at the lower end of the range of customary charges. But the fee customarily charged in the locality for similar services has never been considered the sole determinant of the reasonableness of a fee.[8] This is because reasonableness reflects both the quan-

---

problems the client who sees the advertisement will present, and if you are bound to a predetermined price . . . sooner or later you are going to have to inevitably sacrifice the quality of service you are able to render." App. 378–380.

[6] Similar complications surround the uncontested adoption and the simple bankruptcy.

[7] Use of the term "clinic" to describe a law firm of any size is unusual, and possibly ambiguous in view of its generally understood meaning in the medical profession. Appellants defend its use as justified by their plan to provide standardized legal services at low prices through the employment of automatic equipment and paralegals. But there is nothing novel or unusual about the use by law firms of automatic equipment, paralegals, and other modern techniques for serving clients at lower cost. Nor are appellants a public service law firm. They are in private practice, and though their advertising is directed primarily to clients with family incomes of less than $25,000, appellants do not limit their practice to this income level. *Id.*, at 82.

[8] For example, the American Bar Association's Code of Professional Responsibility specifies the "[f]actors to be considered as guides in deter-

tity and quality of the service. A $195 fee may be reasonable for one divorce and unreasonable for another; and a $195 fee may be reasonable when charged by an experienced divorce lawyer and unreasonable when charged by a recent law school graduate. For reasons that are not readily apparent, the Court today discards the more discriminating approach which the profession long has used to judge the reasonableness of a fee, and substitutes an approach based on market averages. Whether a fee is "very reasonable" is a matter of opinion, and not a matter of verifiable fact as the Court suggests. One unfortunate result of today's decision is that lawyers may feel free to use a wide variety of adjectives—such as "fair," "moderate," "low-cost," or "lowest in town"—to describe the bargain they offer to the public.

B

Even if one were to accept the view that some legal services are sufficiently routine to minimize the possibility of deception, there nonetheless remains a serious enforcement problem. The Court does recognize some problems. It notes that misstatements that may be immaterial in "other adver-

---

mining the reasonableness of a fee . . . ." DR 2–106 (B) (1976). These include:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the service.

"(8) Whether the fee is fixed or contingent."

tising may be found quite inappropriate in legal advertising" precisely because "the public lacks sophistication concerning legal services." *Ante,* at 383. It also recognizes that "advertising claims as to the quality of services . . . are not susceptible of measurement or verification" and therefore "may be so likely to be misleading as to warrant restriction." *Ante,* at 383–384. After recognizing that problems remain in defining the boundary between deceptive and nondeceptive advertising, the Court then observes that the bar may be expected to have "a special role to play in assuring that advertising by attorneys flows both freely and cleanly." *Ante,* at 384.

The Court seriously understates the difficulties, and overestimates the capabilities of the bar—or indeed of any agency public or private—to assure with a reasonable degree of effectiveness that price advertising can at the same time be both unrestrained and truthful. *Ibid.* There are some 400,000 lawyers in this country. They have been licensed by the States, and the organized bars within the States—operating under codes approved by the highest courts acting pursuant to statutory authority—have had the primary responsibility for assuring compliance with professional ethics and standards. The traditional means have been disciplinary proceedings conducted initially by voluntary bar committees subject to judicial review. In view of the sheer size of the profession, the existence of a multiplicity of jurisdictions, and the problems inherent in the maintenance of ethical standards even of a profession with established traditions, the problem of disciplinary enforcement in this country has proved to be extremely difficult. See generally ABA, Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (1970).

The Court's almost casual assumption that its authorization of price advertising can be policed effectively by the bar reflects a striking underappreciation of the nature and mag-

nitude of the disciplinary problem. The very reasons that tend to make price advertising of services inherently deceptive make its policing wholly impractical. With respect to commercial advertising, MR. JUSTICE STEWART, concurring in *Virginia Pharmacy,* noted that since "the factual claims contained in commercial price or product advertisements relate to tangible goods or services, they may be tested empirically and corrected to reflect the truth." · 425 U. S., at 780. But there simply is no way to test "empirically" the claims made in appellants' advertisement of legal services. There are serious difficulties in determining whether the advertised services fall within the Court's undefined category of "routine services"; whether they are described accurately and understandably; and whether appellants' claim as to reasonableness of the fees is accurate. These are not factual questions for which there are "truthful" answers; in most instances, the answers would turn on relatively subjective judgments as to which there could be wide differences of opinion. These difficulties with appellants' advertisement will inhere in any comparable price advertisement of specific legal services. Even if public agencies were established to oversee professional price advertising, adequate protection of the public from deception, and of ethical lawyers from unfair competition, could prove to be a wholly intractable problem.

## II

The Court emphasizes the need for information that will assist persons desiring legal services to choose lawyers. Under our economic system, advertising is the most commonly used and useful means of providing information as to goods and other services, but it generally has not been used with respect to legal and certain other professional services. Until today, controlling weight has been given to the danger that general advertising of such services too often would tend to mislead rather than inform. Moreover, there

has been the further concern that the characteristics of the legal profession thought beneficial to society—a code of professional ethics, an imbued sense of professional and public responsibility, a tradition of self-discipline, and duties as officers of the courts—would suffer if the restraints on advertising were significantly diluted.

Pressures toward some relaxation of the proscription against general advertising have gained force in recent years with the increased recognition of the difficulty that low- and middle-income citizens experience in finding counsel willing to serve at reasonable prices. The seriousness of this problem has not been overlooked by the organized bar. At both the national and state levels, the bar has addressed the need for expanding the availability of legal services in a variety of ways, including: (i) group legal service plans, increasingly used by unions, cooperatives, and trade associations; (ii) lawyer referral plans operated by local and state bars; (iii) bar-sponsored legal clinics; (iv) public service law firms; and (v) group insurance or prepaid service plans. Notable progress has been made over the past two decades in providing counsel for indigents charged with crime. Not insignificant progress also has been made through bar-sponsored legal aid and, more recently, the Federal Legal Services Corporation in providing counsel for indigents in civil cases. But the profession recognizes that less success has been achieved in assuring that persons who can afford to pay modest fees have access to lawyers competent and willing to represent them.[9]

---

[9] A major step forward was taken in 1965 with the initiation of the legal services program of the Office of Economic Opportunity, a program fully supported by the American Bar Association. The legal services program is now administered by the Federal Legal Services Corporation, created by Congress in 1976. Efforts by the profession to broaden the availability of legal services to persons of low- and middle-income levels also gained momentum in 1965.

Study and experimentation continue. Following a series of hearings in 1975, the American Bar Association amended its Code of Professional Responsibility to broaden the information, when allowed by state law, that a lawyer may provide in approved means of advertising. DR 2–102 (1976). In addition to the customary data published in legal directories, the amended regulation authorizes publication of the lawyer's fee for an initial consultation, the fact that other fee information is available on specific request, and the willingness of the attorney to accept credit cards or other credit arrangements. The regulation approves placement of such advertisements in the classified section of telephone directories, in the customary law lists and legal directories, and also in directories of lawyers prepared by consumer and other groups.

The Court observes, and I agree, that there is nothing inherently misleading in the advertisement of the cost of an initial consultation. Indeed, I would not limit the fee information to the initial conference. Although the skill and experience of lawyers vary so widely as to negate any equivalence between hours of service by different lawyers, variations in quality of service by duly licensed lawyers are inevitable. Lawyers operate, at least for the purpose of internal control and accounting, on the basis of specified hourly rates, and upon request—or in an appropriate case—most lawyers are willing to undertake employment at such rates. The advertisement of these rates, in an appropriate medium, duly designated, would not necessarily be misleading if this fee information also made clear that the total charge for the representation would depend on the number of hours devoted to the client's problem—a variable difficult to predict. Where the price content of the advertisement is limited to the finite item of rate per hour devoted to the client's problem, the likelihood of deceiving or misleading is consider-

ably less than when specific services are advertised at a fixed price.

III

Although I disagree strongly with the Court's holding as to price advertisements of undefined—and I believe undefinable—routine legal services, there are reservations in its opinion worthy of emphasis since they may serve to narrow its ultimate reach. First, the Court notes that it has not addressed "the peculiar problems associated with advertising claims relating to the *quality* of legal services." *Ante,* at 366. There are inherent questions of quality in almost any type of price advertising by lawyers, and I do not view appellants' advertisement as entirely free from quality implications. Nevertheless the Court's reservation in this respect could be a limiting factor.

Second, as in *Virginia Pharmacy,* the Court again notes that there may be reasonable restrictions on the time, place, and manner of commercial price advertising. In my view, such restrictions should have a significantly broader reach with respect to professional services than as to standardized products. This Court long has recognized the important state interests in the regulation of professional advertising. *Head* v. *New Mexico Board,* 374 U. S. 424 (1963); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Semler* v. *Dental Examiners,* 294 U. S. 608 (1935).[10] And as to lawyers, the

---

[10] Although *Semler* v. *Dental Examiners* involved a due process issue rather than a First Amendment challenge, the distinction drawn in that case between the advertisement of professional services and commodities is highly relevant. Mr. Chief Justice Hughes, writing for the Court, stated:

"We do not doubt the authority of the State to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only com-

Court recently has noted that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' " [11] *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792 (1975). Although the opinion today finds these interests insufficient to justify prohibition of all price advertising, the state interests recognized in these cases should be weighed carefully

petency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the 'ethics' of the profession is but the consensus of expert opinion as to the necessity of such standards." 294 U. S., at 612.

This distinction, addressed specifically to advertising, has never been questioned by this Court until today. Indeed, *Semler* was recently cited with approval in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792–793 (1975).

[11] The Court's opinion is not without an undertone of criticism of lawyers and the legal profession for their opposition to price advertising: *e. g.*, (i) the reference to the profession "condoning the actions of the attorney who structures his social or civic associations so as to provide contacts with potential clients," *ante,* at 371; and (ii) the implication that opposition to advertising derives from the view that lawyers "belittle the person who earns his living by the strength of his arm" and "somehow [are] 'above' trade," *ante,* at 371–372. This indiscriminate criticism is unjustified. Lawyers are not hermits and society would suffer if they were. Members of the legal profession customarily are leaders in the civic, charitable, cultural, and political life of most communities. Indeed, the professional responsibility of lawyers is thought to include the duty of civic and public participation. As a profession, lawyers do differ from other callings. "This is not a fancied conceit, but a cherished tradition, the preservation of which is essential to the lawyer's reverence for his calling." H. Drinker, Legal Ethics 211 (1963) (footnote omitted). There certainly can be pride in one's profession without belittling those who perform other tasks essential to an ongoing society.

in any future consideration of time, place, and manner restrictions.[12]

Finally, the Court's opinion does not "foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to assure that the consumer is not misled." *Ante,* at 384. I view this as at least some recognition of the potential for deception inherent in fixed-price advertising of specific legal services. This recognition, though ambiguous in light of other statements in the opinion, may be viewed as encouragement to those who believe—as I do—that if we are to have price advertisement of legal services, the public interest will require the most particularized regulation.

## IV

The area into which the Court now ventures has, until today, largely been left to self-regulation by the profession within the framework of canons or standards of conduct prescribed by the respective States and enforced where necessary by the courts. The problem of bringing clients and lawyers together on a mutually fair basis, consistent with the public interest, is as old as the profession itself. It is one of considerable complexity, especially in view of the constantly evolving nature of the need for legal services. The problem has not been resolved with complete satisfaction despite diligent and thoughtful efforts by the organized bar and others over a period of many years, and there is no

---

[12] The Court speaks specifically only of newspaper advertising, but it is clear that today's decision cannot be confined on a principled basis to price advertisements in newspapers. No distinction can be drawn between newspapers and a rather broad spectrum of other means—for example, magazines, signs in buses and subways, posters, handbills, and mail circulations. But questions remain open as to time, place, and manner restrictions affecting other media, such as radio and television.

reason to believe that today's best answers will be responsive to future needs.

In this context, the Court's imposition of hard and fast constitutional rules as to price advertising is neither required by precedent nor likely to serve the public interest. One of the great virtues of federalism is the opportunity it affords for experimentation and innovation, with freedom to discard or amend that which proves unsuccessful or detrimental to the public good. The constitutionalizing—indeed the affirmative encouraging—of competitive price advertising of specified legal services will substantially inhibit the experimentation that has been underway and also will limit the control heretofore exercised over lawyers by the respective States.

I am apprehensive, despite the Court's expressed intent to proceed cautiously, that today's holding will be viewed by tens of thousands of lawyers as an invitation—by the public-spirited and the selfish lawyers alike—to engage in competitive advertising on an escalating basis. Some lawyers may gain temporary advantages; others will suffer from the economic power of stronger lawyers, or by the subtle deceit of less scrupulous lawyers.[13] Some members of the public may

---

[13] It has been suggested that price advertising will benefit younger lawyers and smaller firms, as well as the public, by enabling them to compete more favorably with the larger, established firms. The overtones of this suggestion are antitrust rather than First Amendment in principle. But whatever the origin, there is reason seriously to doubt the validity of the premise. With the increasing complexity of legal practice, perhaps the strongest trend in the profession today is toward specialization. Many small firms will limit their practice to intensely specialized areas; the larger, institutionalized firms are likely to have a variety of departments, each devoted to a special area of the law. The established specialist and the large law firm have advantages that are not inconsiderable if price competition becomes commonplace. They can advertise truthfully the areas in which they practice; they enjoy economies of scale that may justify lower prices; and they often possess the economic power to disadvantage the weaker or more inexperienced firms in any advertising

benefit marginally, but the risk is that many others will be victimized by simplistic price advertising of professional services "almost infinite [in] variety and nature . . . ." *Virginia Pharmacy Board,* 425 U. S., at 773 n. 25. Until today, in the long history of the legal profession, it was not thought that this risk of public deception was required by the marginal First Amendment interests asserted by the Court.

MR. JUSTICE REHNQUIST, dissenting in part.

I join Part II of the Court's opinion holding that appellants' Sherman Act claim is barred by the *Parker* v. *Brown,* 317 U. S. 341 (1943), state-action exemption. Largely for the reasons set forth in my dissent in *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748, 781 (1976), however, I dissent from Part III because I cannot agree that the First Amendment is infringed by Arizona's regulation of the essentially commercial activity of advertising legal services. *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942); *Breard* v. *Alexandria,* 341 U. S. 622 (1951). See *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376 (1973).

I continue to believe that the First Amendment speech provision, long regarded by this Court as a sanctuary for expressions of public importance or intellectual interest, is demeaned by invocation to protect advertisements of goods and services. I would hold quite simply that the appellants' advertisement, however truthful or reasonable it may be, is not the sort of expression that the Amendment was adopted to protect.

I think my Brother POWELL persuasively demonstrates in his opinion that the Court's opinion offers very little guidance as to the extent or nature of permissible state regulation of professions such as law and medicine. I would join

---

competition. Whether the potential for increased concentration of law practice in a smaller number of larger firms would be detrimental to the public is not addressed by the Court.

his opinion except for my belief that once the Court took the first step down the "slippery slope" in *Virginia Pharmacy Board, supra,* the possibility of understandable and workable differentiations between protected speech and unprotected speech in the field of advertising largely evaporated. Once the exception of commercial speech from the protection of the First Amendment which had been established by *Valentine* v. *Chrestensen, supra,* was abandoned, the shift to case-by-case adjudication of First Amendment claims of advertisers was a predictable consequence.

While I agree with my Brother POWELL that the effect of today's opinion on the professions is both unfortunate and not required by the First and Fourteenth Amendments, I cannot join the implication in his opinion that some forms of legal advertising may be constitutionally protected. The *Valentine* distinction was constitutionally sound and practically workable, and I am still unwilling to take even one step down the "slippery slope" away from it.

I therefore join Parts I and II of the Court's opinion, but dissent from Part III and from the judgment.