705 A.2d 1121

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Jackie Ray WILLS.**

**Misc. (Subtitle BV) No. 20, Sept. Term, 1996.**

Court of Appeals of Maryland.

Feb. 12, 1998.

634

Melvin Hirshman, Bar Counsel, and John C. Broderick, Assistant Bar Counsel, for the Attorney Grievance Commission of Maryland, Petitioner.

Kevin J. McCarthy, Lanham, for Respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

RODOWSKY, Judge.

This bar discipline case illustrates the consequences of this Court's adoption, by a divided vote, of Maryland Rules of Professional Conduct 7.2 and 7.3 that allow targeted mail solicitation. At the vortex of the controversy is Geraldine E. Butler (Butler), a paralegal with twenty years experience in working on personal injury cases. Butler left the employ of the complainant, Xavier Aragona (Aragona), when he sought to reduce her compensation package from approximately $87,-000 to $50,000 per year. The respondent, Jackie Ray Wills (Wills), a sole practitioner, then hired Butler for $80,000 per year. Butler brought to Wills's practice an enthusiasm for marketing herself and her employer, as well as counterpart client information cards on closed cases at the Aragona firm.

The charges now before us were heard by Judge G.R. Hovey Johnson of the Circuit Court for Prince George's County. Judge Johnson found a violation of Rule of Professional Conduct 7.2(c) ("A lawyer shall not give anything of value to a person for recommending the lawyer's services....") and that Wills deliberately lied in an answer at the inquiry panel hearing, thereby violating Rule 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"). Judge Johnson also found violations of Rule 8.1(a) ("[A] lawyer ... in connection with a disciplinary matter, shall not ... knowingly make a false statement of material fact[.]") and of Rule 8.4(d) ("engag[ing] in conduct that is prejudicial to the administration of justice").

## I

In this Part I we consider the solicitation charge.

Aragona was engaged in the private practice of law in Oxon Hill, Prince George's County, Maryland. In January 1983, primarily as a result of Butler's having acquired ten years of

experience processing personal injury cases for Paul Shiffman, an attorney in the District of Columbia, Aragona and his then partner, John T. Szymkowicz (Szymkowicz), hired Butler as a legal assistant. Butler's starting salary with Aragona & Szymkowicz was just over $40,000 per year.

As early as 1987, Butler became dissatisfied with working for Szymkowicz. She began to entertain the thought of leaving Aragona & Szymkowicz to associate herself with some novice attorney seeking to establish a thriving personal injury practice. She abandoned those plans, however, when Szymkowicz left the firm in 1991. Butler remained in the employ of the firm until April 1993.

In February 1993, Butler initiated contact with Wills for the purpose of obtaining employment with him. At that time, Wills maintained an office for the general practice of law in Waldorf, Maryland. The majority of his practice was devoted to domestic relations and criminal defense, with only a moderately successful personal injury practice. Butler assured Wills that she could assist him in building a successful personal injury practice, because, in addition to her expertise in the area, she had " 'lots of contacts and friends, [that she thought could] generate business over a period of time.' " At the time of these initial contacts between Butler and Wills, the latter explained to his longtime secretary, Joy Hamilton (Hamilton), that Butler "had many, many acquaintances and had done the personal injury work for many years and felt that she could generate a great deal of business for the firm." Wills located office space in Oxon Hill and, in mid-May 1993, opened an office there.

On Friday, April 9, 1993, during the time when Butler was conducting employment negotiations with Wills, Aragona informed Butler that her compensation package, which at that time approximated $87,000 per year and included a fully paid health insurance plan, a car lease for personal use, and a gasoline credit card, was to be reduced to a salary of $50,000 per year and that her health plan and car lease were to be terminated. On Monday, April 12, 1993, Butler informed

Aragona that she could not work under his proposed terms and intended to seek employment elsewhere, to which he responded that she should leave immediately. Later that same day Butler and Wills signed an employment contract under which she would receive a weekly salary aggregating $80,000 per year. The contract conditioned further employment on Wills's practice having acquired 100 personal injury files within a year from the date the contract was executed.[1]

In the period before Butler received a salary from Wills, she brought to Wills's Waldorf office copies of client information cards which contained the name, date of accident, address, phone number, insurance information, and additional information of many of Aragona's personal injury clients. Butler had accumulated these cards over the course of her ten years of employment with Aragona's firm and had failed to destroy her copies, as per office policy, after the files were closed.

At Wills's instruction, Butler generated announcements to prospective clients. The form letter read as follows:

"[Name & Address of Specific Individual]

"The Law Offices of Jack R. Wills, Esquire are pleased to announce the opening of their newest office located at Gateway East, 6188 Oxon Hill Road, Suite 701, Oxon Hill, Maryland, 20745.

"Geri Butler, Legal Assistant to Jack R. Wills can be reached at the new office for all of your personal injury needs or questions at (301) 839–9000.

"The Waldorf office of Jack R. Wills will remain available for domestic relations, civil, criminal, bankruptcy and other related needs at The Hamilton Centre, 3200 Crain Highway, Suite 208, Waldorf, Maryland, (301) 843–2700, (301) 645–8636 or 1–800–894–5583. Free consultations are standard for the first visit.

---

1. The photocopy of the contract that is in evidence did not reproduce the starting date of the first year of the employment. The date selected was on or about the anticipated occupancy of the Oxon Hill office.

"We hope that if you require any of the above services, you will contact one of these conveniently located offices.

"Very truly yours,

"Jack R. Wills,

"Attorney at Law."

Between 200 and 300 of these letters were addressed, and perhaps 100 were mailed. The overwhelming majority of the addressees were individuals whose names were on the client information cards.

In May 1993, Aragona filed a complaint with Bar Counsel. He also caused a criminal prosecution for theft to be instituted against Butler, and his firm filed a civil suit against Butler and Wills. Butler was acquitted of the criminal charge, and Wills settled the civil action by paying a sum of money.

Aragona's complaint to Bar Counsel against Wills focused on Butler's having taken copies of the cards containing identifying information on clients whose cases were closed. An inquiry panel was convened to consider whether Wills should be charged with having violated Rule 5.5 ("A lawyer shall not ... assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."), Rule 7.3 (limiting and prohibiting certain in-person contact with a prospective client for the purpose of obtaining professional employment), and Rule 8.4(d). The inquiry panel recommended that the alleged violations of Rules 5.5 and 7.3 be dismissed. That body, however, concluded "that the conduct of Mr. Wills in collusion with Ms. Butler is a violation of Rule 8.4(d)." The panel also concluded that Wills made a misrepresentation to the panel, discussed in Part II, *infra*, but that the misrepresentation was immaterial.

The Review Board recommended that Wills be charged with violating Rules 8.1(a), 8.4(c), and 8.4(d). Based upon the facts relied upon by the Review Board, Bar Counsel included in the Petition for Disciplinary Action the charge of having violated Rule 7.2(c). *See Attorney Grievance Comm'n v. Goldsborough*, 330 Md. 342, 354–55, 624 A.2d 503, 508–09 (1993) (It is not improper for Bar Counsel to include in its petition charges

of Rule violations not specifically found by the Review Board as long as the charges are plainly related to other violations explicitly found by the Review Board.).

When the charges were heard by Judge Johnson, Bar Counsel presented the case against Wills on a stipulation of facts, the transcript of proceedings before the inquiry panel, the transcripts of the testimony of certain witnesses taken in connection with collateral proceedings, and other exhibits. Only Wills testified. There was no testimony in any form from any addressee of the announcement letters. Judge Johnson concluded that Wills had violated Rule 7.2(c) on the following analysis:

> "Wills ... knowingly hired Butler not for her legal or secretarial skills but with the primary motive/purpose of obtaining the personal injury clients that could be delivered through Butler's access to the white copy of the information forms from Aragona, [Shiffman], and/or her own personal client contacts. Rule 7.2(c), the advertising rule, is the most appropriate one to apply to this violation. While this particular form of payment for referrals is a matter of first impression now before this Court, it is analogous to paying 'runners' or 'bird dogs' for referrals as discussed under 7.2(c). These are similar practices for which the Court has previously disciplined lawyers. See Attorney Grievance Commission v. Freedman, 285 Md. 298, 402 A.2d 75 (1979) and *Attorney Grievance Commission v. Lebowitz,* 290 Md. 499, 431 A.2d 88 (1981). Butler brought no specific qualifications that would justify such an exorbitant compensation package; thus, it is clear that she was being compensated for her services in bringing in clients."

We begin our analysis by noting what this case does not involve. It does not involve the law of unfair competition, despite the emphasis which Aragona, the inquiry panel, Bar Counsel, and Judge Johnson have placed on the circumstances surrounding Butler's possession of the client cards. We need express no opinion on the nature or extent of any interest which Aragona had in those cards, nor on whether civil remedies were available to him. We are concerned in Part I

of this opinion only with whether the use made of the cards violated Rule 7.2(c).

Moreover, this case does not involve in-person solicitation. Although Butler admitted that she telephoned a number of persons to advise them of her change of employment, Bar Counsel did not contend, and Judge Johnson made no finding, that this conduct constituted solicitation.

This case does involve a lawyer's responsibilities "[w]ith respect to a nonlawyer employed or retained by or associated with a lawyer." Rule 5.3. These include "mak[ing] reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer." Rule 5.3(a). The nonlawyer employees of a lawyer are not subject to professional discipline. *See* Comment to Rule 5.3. The lawyer, however, is, under certain circumstances, "responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer." Rule 5.3(c). Obviously, a lawyer may not hire an employee for the purpose of having that person solicit on behalf of the lawyer. Rule 7.2(c).

On the other hand, the prohibition of Rule 7.2(c) against a lawyer's giving "anything of value to a person for recommending the lawyer's services," is not more restrictive of an employee's conduct than it is of the lawyer's conduct. Phrased another way, there is no violation of the quoted portion of Rule 7.2(c) if the lawyer's employee engages in conduct in which the lawyer permissibly may engage directly.

Rule 7.2 does not prohibit direct mail advertising, targeted to specifically identified persons, even if they are not "a close friend, relative, former client or one whom the lawyer reasonably believes to be a client." Rule 7.3(a)(1). Rule 7.2(a), subject to the prohibition of Rule 7.1 against false and misleading communication and subject to the restrictions and prohibitions of Rule 7.3 against in-person contact, specifically permits a lawyer to "advertise services through public media

. . . or through communications not involving in person contact."

The Maryland Rules of Professional Conduct were proposed by a select committee appointed by this Court to study the ABA Model Rules of Professional Conduct. *See* Annotated Code of Maryland, 1 Maryland Rules (1998) at 11; 13:11 Md. Reg. 3 (May 23, 1986). The Maryland Rules of Professional Conduct were adopted by Order dated April 15, 1986, and became effective January 1, 1987. *See id.* The decision to permit "direct mailing by attorneys to specific persons known to need specific legal services, when the motive for that direct contact is pecuniary gain" was made after full deliberation. Dissenting Memorandum of McAuliffe, J., Md.Code, 1 Md. Rules at 12; 13:11 Md. Reg. 3. Under this change of policy in the wake of *Bates v. State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the decisions of this Court interpreting and applying the predecessor Maryland Code of Professional Responsibility that were relied upon by Judge Johnson are of diminished relevance.

In Rule 7.2(c) the prohibited "recommending" of the lawyer's services by one to whom the lawyer has given something of value cannot include permissible advertising. The comment to Rule 7.2 makes plain that "[p]aragraph (c) does not prohibit paying regular compensation to an assistant, such as a secretary, to prepare communications permitted by this Rule." The modifier, "regular," of "compensation" is concerned with the prohibition against fee sharing with a layperson and not with solicitation. Clearly, permissible direct mail advertising does not become impermissible if the compensation to the employee is "irregular."

An unpublished opinion of the Maryland State Bar Association Committee on Ethics, Ethics Docket 88–23 of May 9, 1988, dealt with a pre-paid legal services company whose sales representative received remuneration for her services. The Ethics Committee opined that there was no violation of Rule 5.4(a), proscribing fee sharing with a nonlawyer, or of Rule 7.2(c), because there was no indication that the sales associate,

who was paid from premium income, received a portion of the legal fees, and because a lawyer is permitted to pay reasonable costs of permissible advertising. *See also* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1440 (1979) (forty-lawyer firm does not violate DR 3–102 by paying firm's lay office administrator an annual salary and also "a percentage of net profits which might represent one-fourth to one-third of the administrator's total compensation").

F.C. Moss, *The Ethics of Law Practice Marketing*, 61 Notre Dame L.Rev. 601 (1986), reaches the following conclusion:

"May a law firm hire a nonlawyer to handle its public relations and advertising work where that person is a full-time employee of the firm rather than an independent contractor? This would be no different than hiring a paralegal assistant, and no doubt perfectly proper. There would be no fee sharing problems if the employee is compensated on a salaried basis.... However, the assistant would always act for the lawyer and the employing attorney would be responsible for any actions of the assistant which violated the professional rules of ethics or statutes of the state. This responsibility includes the duty to train and supervise the assistant."

*Id.* at 693 (footnote omitted).

Judge Johnson based his finding that Rule 7.2(c) had been violated primarily on the conclusion that the $80,000 per year salary promised by Wills to Butler under the employment contract was unreasonable compensation for a personal injury paralegal and that the unreasonable excess was something of value paid for recommending Wills's legal services. That conclusion is not supported by the evidence, in two aspects. First, there is no evidence of the compensation generally paid to highly experienced personal injury paralegals in the Washington, D.C. metropolitan area by law offices that have 100 or more personal injury cases in the course of a year. The only evidence of compensation, in addition to that paid by Wills, was the approximately $87,000 compensation package paid to Butler by Aragona. Aragona testified, in effect, that no part

of Butler's compensation from his firm was for recommending clients. Under that testimony all of Butler's compensation at the Aragona firm would have been for paralegal services.[2]

Second, even if Judge Johnson, as a matter of judicial notice, could conclude that Butler's compensation from Wills was unreasonably excessive for a paralegal, the unquantified excess could properly be paid by Wills for permissible advertising services. Although the $80,000 per year promised by Wills to Butler strikes one as high, that salary, in and of itself, does not support an inference, to the required degree of clear and convincing evidence, that Butler, with the direction, knowledge, or ratification of Wills, was engaged not merely in permitted advertising, but also in conduct amounting to prohibited solicitation, if performed by a lawyer.

## II

The charges of violations of Rules 8.1(a) and 8.4(c) involve testimony by Wills at the initial hearing before the inquiry panel on January 4, 1995, concerning when Hamilton left Wills's employ. Hamilton was deposed by counsel for Aragona in his civil action on January 23, 1995. The initial questions at the deposition included the following:

---

**2.** At the inquiry panel hearing, Aragona, under examination by Bar Counsel, testified as follows:

"[Q] Is it true that Ms. Butler was paid so handsomely because her presence guaranteed a certain minimal level of personal injury clients?

"[A] I'd like to say that, but that's not true. What it was, and I don't like to castigate anybody, I think my partner [Szymkowicz] got very comfortable—

. . . .

"I think my partner got very comfortable with the fact that [Butler] always ingratiated herself and ... developed a personal rapport with these clients at a point where they were developing a loyalty to her and not to the firm. She used to give some, one man who was a real simpleton, little chocolate bunnies just to keep him happy, and another man she gave Tootsie Rolls to. So for a Tootsie Roll, all of a sudden she was their God. And I began to say, you know, we got ten people here. These people belong to the firm, not to you. And then when it came to the confrontational part, she acted like I can get you now because all these people will go with me. And that's when it came to a head."

"Q   Can you tell me, ma'am, when did you start your employment with Mr. Wills?

"A   In August of 1987.

"Q   And when was your last day of employment with him?

"A   December 30th, 1994."

All but the last six months of the employment described by Hamilton was at Wills's Waldorf office.   When that office closed she worked in the Oxon Hill office.

Hamilton had been subpoenaed for that deposition, originally scheduled for December 29, 1994, in mid-December 1994. At that time Hamilton and Wills had one or more conversations about the forthcoming deposition.   Hamilton knew "that what [she] had to say wasn't what Mrs. Butler had been saying."   Hamilton testified on deposition that, in the mid-December conversation,

"I made him aware of [Butler's] drinking problem, and I told him some of the things that he needed to be aware of regarding this situation.   One of those things was the fact that [Butler] had burned the cards [after her arrest].   To my knowledge, he had no knowledge of that whatsoever before I told him that."

Counsel then examined on whether Wills had put pressure on Hamilton to modify her testimony.   The gist of that examination is set forth below (objections omitted):

"Q   In other words, he implied that if you testified the way you had intended, you would cause him harm?   [A] Yes.

. . . .

"Q   And did he ask you not to testify the way that you intended to?   [A] He never, never asked me to do that, no."

Hamilton described Wills as saying that Hamilton's testimony would have serious consequences and that he, Wills, could be disbarred.

At the panel hearing of January 4, 1995, only Wills and Butler testified.   Most of the questioning was concerned with the latter part of April and the first part of May 1993 when

Butler, before she was paid a salary by Wills, was sending out the announcement letters from Wills's Waldorf office. In answer to questions by one panel member, Wills explained that the other clerical person did all of the general work in the office including typing and bookkeeping, particularly on divorce and bankruptcy cases. Another panel member then questioned Wills as follows:

"[Q] [W]hat was your staff in Waldorf?

"[A] Just Ms. Hamilton.

"[Q] Just Ms. Hamilton?

"[A] One secretary.

"[Q] One secretary?

"[A] Yes.

"[Q] And is she still with you?

"[A] Yes.

"[Q] She is the other clerical person?

"[A] Yes. . . .

"[Q] What did you pay Ms. Hamilton in Waldorf?

"[A] $26,500 I believe.

"[Q] And what do you pay her now?

"[A] $26,500."

The inquiry panel hearing was resumed on March 14, 1995. Wills testified that Hamilton had left his employ primarily because she preferred to work in Waldorf and that she was still willing to work for Wills on a contract basis. Bar Counsel asked Wills when Hamilton left his employ, and Wills answered:

"She was working for me on a—she—January 1 she went off the payroll as such, the first few days of the next week she worked for covering the office because I was up here.[3] So she covered the office on the day I was up here. And she still has an arrangement with me to come in on Saturdays if I need her, as long as she doesn't have to work with [Geri]."

---

**3.** The inquiry panel hearings were held in Columbia, Maryland.

When confronted with his statement made on January 4, 1995, that he was then paying Hamilton $26,500 per year, Wills replied that that was the rate at which she was being paid while she was working just a few days a week.

Based on the foregoing, the charges filed against Wills included violating Rules 8.1(a) and 8.4(c). It appears that these charges were brought by mistake. The inquiry panel found that Wills misrepresented the status of Hamilton's employment, but it also found that the representation was not material. In its report and recommendation, however, the Review Board erroneously stated that the inquiry panel "found this misrepresentation to be material."

Judge Johnson sustained the charges, reasoning as follows:

"Wills misled the Inquiry Panel into believing that Hamilton was still working for him, because he knew that if Hamilton were asked to testify under oath (which was likely to happen if it were made known that she had terminated her employment), that she would likely state damaging information which could then lead to sanctions against him or disbarment. This deception violated Rule 8.1(a) ... and also Rule 8.4(c).... Dishonesty before disciplinary authorities could fall under both the narrow proscription of Rule 8.1(a) and the broader proscription of Rule 8.4(c)."

There is no basis in the evidence for finding that the answers given by Wills on January 4, 1995, were material to the issues before the inquiry panel. The argument for materiality is premised on the notion that, if the panel thought that Hamilton was still in Wills's employ, it was unlikely that Hamilton would be called as a witness, but that, if the panel knew that Hamilton no longer worked for Wills, it was likely that she would be called and give incriminating evidence against Wills. This account overlooks the fact that Hamilton had been served with a subpoena for a deposition while she was in the full-time employ of Wills, and that her deposition was initially scheduled to be taken while she was still in that full-time employ. Although the deposition was postponed and had not been taken by January 4, 1995, Wills knew full well

that Hamilton would be interrogated by counsel for Aragona, a plaintiff in the civil suit pending against Wills and Butler, and the complainant in the bar discipline proceedings. Because that examination would focus on events in the Waldorf office in April and May of 1993, there is no apparent reason why Wills would intentionally misrepresent Hamilton's employment status a few days after New Year's Day of 1995. The record fails to demonstrate, by clear and convincing evidence, that the January 4, 1995 testimony of Wills related to a material matter.

Nevertheless, Rule 8.4(c) is broad enough to include intentionally deceptive or misleading testimony, even if it does not relate to a material matter. In the instant case, the basis for contending that the testimony of Wills was intentionally misleading is the same argument made in support of its materiality and is subject to the same analysis set forth above. Further, nothing in Hamilton's testimony contradicts Wills's testimony on March 14, 1995, that, on January 4, 1995, Hamilton was covering the office for Wills and Butler and that she had done occasional work for Wills thereafter, at a rate of compensation equal to the rate of her prior annual salary. Under the facts of this case, there is absent clear and convincing evidence of a motive for Wills to lie about an immaterial matter. Thus, the charge of violating Rule 8.4(c) has not been sustained.

The charge of violating Rule 8.4(d) is cumulative of the other charges and is similarly insufficiently supported.

Now, therefore, it is this 12th day of February, 1998 by the Court of Appeals of Maryland

ORDERED that the petition for disciplinary action against the respondent, Jackie Ray Wills, in Misc. Docket (Subtitle BV) No. 20, September Term, 1996, be and the same is hereby dismissed; and it is

FURTHER ORDERED that the costs in these proceedings be paid by the Attorney Grievance Commission of Maryland.

IT IS SO ORDERED.