**In re Christopher C. GERMAIN, Diane Germain, Debtors.**

**No. 99–14811 K.**

United States Bankruptcy Court, W.D. New York.

May 23, 2000.

---

Joseph W. Keefe, Buffalo, NY, for Debtors.

Douglas M. Fisher, Solomon and Solomon, P.C., Albany, NY, for Creditor.

MICHAEL J. KAPLAN, Bankruptcy Judge.

The Objection to Claim that is before the Court today addresses the notion that a client may be liable for damages caused by her lawyer's abuse of legal process in her name, and the Court finds that she is not liable here where a contrary result would make her a victim of the combined effect of the failure of the legal profession to regulate lawyer advertising, the desire of a law firm to pass its overhead costs onto its opponents' clients, and the fact that rules of court do not require that a plaintiff sign an initial pleading.

In July of 1998, Christopher and Diane Germain retained a law firm, Andrew F. Capoccia, L.L.C., which extensively advertised a "debt reduction" program on television and radio and in newspapers. After the "debt reduction" program failed, the Debtors filed for Chapter 13 relief here. They then learned, for the first time, that as an unadvertised element of its "debt reduction" program, Andrew F. Capoccia, L.L.C. had filed a lawsuit in Diane Germain's name against Solomon and Solomon, P.C. (a law firm) alleging violations of the Fair Debt Collections Practices Act. This was one of more than 85 such state court suits that the Capoccia firm had brought against that firm in the name of clients enrolled in its "debt reduction" program. Each action sought a statutory $1,000 remedy, plus attorneys' fees, costs, etc. Eighty-five of those suits were thrown out of state court and the Capoccia firm was sanctioned $10,000 per lawsuit (a total of $850,000), but those sanctions were directed to be paid to the New York Client Security Fund and not to the defendants, Solomon and Solomon, P.C. Having been a "prevailing defendant," Solomon and Solomon, P.C. has filed a $100,000 proof of claim here against Mrs. Germain, sounding in "malicious prosecution."[1] But for this claim, the Germains' Chapter 13 plan would pay $.51 on the dollar to unsecured creditors over the course of five years. If this $100,000 claim were allowed, the percentage would drop to 10% or less. Moreover, Solomon and Solomon, P.C. has taken the Order of Confirmation up on appeal on various substantive grounds, and the Debtors challenge that firm's standing; that firm is not a creditor, they argue.

Solomon and Solomon, P.C. explains that although the 85 suits were dismissed by the state trial court, and although the Fair Debt Collection Practices Act suit was not a malpractice suit, the firm was denied renewal of its malpractice policy because it had been sued so many times.

---

1. Whether there has been abuse of process or malicious prosecution has not yet been adjudicated. It is assumed arguendo for purposes of this decision.

The replacement policy increased the annual premium from $25,000 with a $25,000 deductible to a $45,000 premium with a $100,000 deductible. The firm has existed, it claims, for over 25 years, and the cause of the cancellation was the totality of suits brought against it by the Capoccia firm's clients. Consequently, Solomon and Solomon, P.C. "holds all [85] Plaintiffs jointly and severally liable for the full damages caused by these actions." [2]

This Court disqualified the Capoccia firm from further representing the Germains here, and directed it to obtain substitute counsel for the Germains in the prosecution of their objection to that $100,000 proof of claim. The objection duly came before the Court, with substituted counsel for the Debtors, for an evidentiary hearing. A member of the law firm which is the successor to the "Law Offices of Andrew F. Capoccia, LLC" testified about the Germain file, under subpoena issued by Solomon and Solomon, P.C.

The Court has heard all of the circumstances by which the Germain's retention of the Capoccia firm ("to render all needed and necessary services and to take any and all actions and proceedings necessary which the Law Offices of Andrew F. Capoccia, L.L.C. may deem advisable to settle and compromise in whole or in part certain specified and outstanding creditor actions, claims, proceedings, demands and obligations") ended up with these Debtors defending a $100,000 damages claim brought by a law firm which had represented one of their credit card creditors.

The following constitutes the Court's findings of fact, conclusions of law, and judgment.

## FACTS

Because the claim is only against Diane Germain, Mr. Germain did not take the stand. It is clear from the undisputed evidence, that the Germains were unaware of any lawsuit having been filed on behalf of either of them against anyone. From time to time they received correspondence from the Capoccia firm regarding settlement of various debts. But they were not regularly "copied" on correspondence that was sent on their behalf to or from the Capoccia firm. Moreover, the initial pleading in the state court action was signed by a representative of the Capoccia firm (and not by Diane Germain), as is permitted under state law.

Not only did they not know of the suit, but there is no evidence whatsoever that it was their desire or intention that the Capoccia firm sue anyone on their behalf. Mrs. Germain's testimony that she "never hired Capoccia to sue anybody," but only hired it to "settle my debts," was entirely credible. Efforts by claimant's counsel to elicit testimony that she must have known that "that's what lawyers do; they sue people" failed. Indeed, the Court is satisfied that Mrs. Germain testified truthfully when she stated that she did not even know that having had "judgments entered" against her required that there have been some "litigation." And this Court specifically finds that there was no actual intent on Diane Germain's part to employ the Capoccia firm to commence any litigation, but rather merely to defend her against the claims being made by, and against the judgments entered against her and her husband by, their creditors.

## PERSUASIVE PRECEDENT

Having made this finding, the Court concludes that this matter falls squarely within a proposition enunciated by an intermediate appellate court in the state of Washington, and adopted in two other decisions. This Court is aware of no contrary decisions and finds the analysis by that intermediate state court to be sound and entirely persuasive. It said:

> An attorney in discharging his professional duties acts in a dual capacity. In

2. In light of today's holding, it is not necessary to probe the evidentiary basis for the claim that it was these supposedly baseless suits that caused the loss of coverage.

a limited or restricted sense he is an agent of his client. But he has powers, including those to issue judicial process, far superior to those of an ordinary agent.

As an officer of the court, his duties are both private and public. Where the duties to his client to afford zealous representation conflict with his duties as an officer of the court to further the administration of justice, the private duty must yield to the public duty. He therefore occupies what might be termed as a 'quasi-judicial office.' [citations omitted]

By its very nature, an abuse of legal process by an attorney ... violates an attorney's oath, canons of ethics and his duty to the public as an officer of the court....

Accordingly, the scope of the attorney's implied authority as an agent should not, as a matter of law, extend to acts which constitute an abuse of legal process....

It follows then that if an attorney has, without the knowledge or consent of his client, abused process to the damage of another, the attorney acts outside the scope of his agency and the client should not be derivatively liable....

*Fite v. Lee*, 11 Wash.App. 21, 521 P.2d 964, 968–69 (1974).

This reasoning and result were quoted and followed by the same court in a later case (*Demopolis v. Peoples Natl. Bank of Washington*, 59 Wash.App. 105, 796 P.2d 426, 434 (1990) ("*Fite* seemingly limits a client's liability for his or her attorney's defamatory communications to situations in which the attorney acted within the scope of employment, and with the client's knowledge and consent")), and by another state court (*Pheils v. Garber–Lawrence Publishing Group, Inc.*, 1993 WL 513200, at *1 (Ohio Ct.App., Dec. 10, 1993) ("An

attorney who acts beyond the bounds of law, without the knowledge or consent of the client, cannot create derivative liability which would result in the client being held responsible for the attorney's wrongdoing.").) [3]

■ Because Diane Germain did not have knowledge of the lawsuit commenced against Solomon and Solomon on her behalf, nor did she consent to same or ratify the same, she is not derivatively liable for any damage caused by the Capoccia firm's filing suit in her name.

## THE RETAINER AGREEMENT WILL BE NARROWLY CONSTRUED: IT DOES NOT WARRANT A DIFFERENT RESULT

■ This Court specifically rejects Solomon and Solomon, P.C.'s argument that her consent was manifested in the retainer agreement which, as noted above, stated that the Capoccia firm was retained and employed "to render all needed and necessary services and to take any and all actions and proceedings necessary which the [firm] may deem advisable to settle and compromise in whole or in part certain specified and outstanding creditor actions, claims, proceedings, demands and obligations" in consideration of which the Germains agreed to pay 25% of the total reduction of creditor claims. The entire retainer agreement is brief, and is attached hereto as Exhibit 1.

The Debtors hasten to point out that the agreement also contained the following statement: "Services rendered which are not usual and customary to debt reduction will be charged separately. However, any additional services rendered on my behalf must first be authorized by me [the client] and the fee for such services must be agreed upon in advance."

**3.** See also *Horwitz v. Holabird & Root*, 312 Ill.App.3d 192, 244 Ill.Dec. 657, 726 N.E.2d 632 (2000) (holding that derivative liability might extend to clients who did not know about or consent to their counsel's torts, if they later ratified his actions. The dissent was premised on the notion, expressed in some other cases, that counsel is an independent contractor, not a client's agent.)

The Court would look more closely at the Debtors' argument as to what was *not* included if it thought it necessary. But it is not necessary to examine this argument because the statement of what the Capoccia firm *was* retained and employed to do is not broad enough to sustain Solomon and Solomon, P.C.'s argument. As stated in open court, this Court does not believe that a consumer should have to consult one attorney in order to find out whether it should sign a retainer agreement with another attorney with regard to consumer-type legal concerns. As to matters for which consumers hire lawyers regarding consumer matters, Solomon and Solomon, P.C.'s arguments to the effect that "a lawyer is a tank," and that policing the actions of an attorney must be left to the courts that hear malpractice claims by clients, is wrong.

Rather, this retainer agreement should be construed narrowly, in the Debtor's favor, for three related and aggregated reasons, each pertaining to ways in which an opposite result would make Mrs. Germain a victim of idiosyncracies of the legal profession.

### 1. ADVERTISING

■ The first is the Capoccia advertisements. Consumers go to lawyers to have the lawyers do what is "necessary and proper" to address their legal problems. Indeed, as a general proposition, "an attorney of record has implied authority to do everything necessary and proper in the regular and ordinary conduct of a case ..."[4] No retainer agreement should be construed to mean that an attorney is being hired to do what is *un*necessary or *im*proper. Attorneys are "officers of the court." They are admitted to practice by a court and they are regulated by a court. It is our courts that permit the type of lawyer-advertising involved here, touting a "debt reduction" program that goes undefined by any form of regulation.[5]

Mrs. Germain picked the Capoccia firm because of the advertisements. A consumer has every right to believe that what is being permitted to be advertised is not an abuse of legal process. She is justified in believing that the "product" that the attorney is offering has been pre-approved by the courts that regulate attorney practice and conduct. The profession must bear the responsibility.[6]

### 2. INSURANCE IS OFFICE OVERHEAD FOR THIS CLAIMANT

■ Secondly, the party alleging that it was damaged is itself a member of the profession, a law firm regularly suing consumers on consumer-type debts and regularly dealing with Capoccia's advertised "product." No consumer having typical consumer debt problems should be expected to bear the increased cost of doing business that her creditor's lawyers suffer when her lawyer oversteps the bounds of proper legal process. Solomon and Solomon, P.C.'s claim here is far beyond the ambit of any notion of "reasonably foreseeable consequence" of the Germains having signed this retainer agreement. Solomon and Solomon, P.C. must accept the overhead costs of the profession it has chosen, except to the extent that it might hold

**4.** 7 Am.Jur.2d, Attorneys at Law § 166 (1997).

**5.** Although *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) established that disciplinary rules that restrict lawyer advertising may violate the first amendment, it recognized therein that lawyer advertising that is misleading is not entitled to first amendment protection. See 433 U.S. 350, 383, 97 S.Ct. 2691.

**6.** The Attorney General of this state has brought suit against the Capoccia firm. The District Court, of which this Bankruptcy Court is a "unit," denied admission to Mr. Capoccia and some others of the firm who elected not to provide information that was requested by the Court as a pre-condition to admission.

another member of the profession, the Capoccia firm, liable.

## 3. RULES OF COURT THAT WAIVED MRS. GERMAIN'S SIGNATURE ARE INTENDED TO BENEFIT THE CLIENTS

Lastly, it must not be forgotten that it is by virtue of a rule of court that a client's signature is not usually required on an initial pleading. This may be of great benefit where an attorney must commence process in an emergency or in a case involving multiple parties plaintiff. But it was of no benefit to Mrs. Germain here.[7] It is unlikely that the element of "malice," required to be proven in any instance in which one seeks to recover for improperly causing process to issue[8] could ever be proven where the plaintiff did not herself sign the complaint and where there is no evidence that she specifically instructed her attorney to sign it for her. Such a retainer agreement as is at issue here will not be read to provide that missing link in this claimant's case.

If rules of court have made it difficult or impossible for a law firm that is a prevailing defendant in a lawsuit to hold the plaintiff liable in damages after proving that the suit was filed for a wrong or improper motive, then the result should be to persuade the courts to change the rule so as to require the plaintiff's own signature on the complaint. This Court will not impute malice to the client on the basis of this retainer agreement alone.

## CONCLUSION

If the Solomon and Solomon firm had wished here to preserve a right to claim against Diane Germain for malicious prosecution, it should have taken steps to assure her actual knowledge of and participation in the state court action before it sought, successfully, to have that action

dismissed. Having failed to do so, it cannot prevail here on undisputed evidence that the action alleged to have been a malicious prosecution was instituted in her name by her then-attorney without her knowledge, consent or ratification. Claim 21 is expunged under 11 U.S.C. § 502(b)(1), as it is a claim that is not enforceable against either of these Debtors.

The Debtor's objection to the claim of Solomon and Solomon, P.C. is sustained. The Court hereby vacates its direction that Solomon and Solomon, P.C. file a brief supporting its argument that each of the 85 plaintiffs may be held to answer for all of the firm's damages (1/85th of a $100,000 claim would have been a $1,176.48 claim, against which the Debtor might well not have filed any objection at all).

As suggested above, the result might be different in a non-consumer context. Among the many ways in which the two contexts are different are: lawyer advertising is not likely a factor in the decision to employ a particular counsel in a non-consumer context; some non-consumer contexts imply a much higher level of client awareness and sophistication than is evident in consumer-type legal problems (for example, one who hires an attorney to protect intellectual property rights probably has some sense of the type of disputes that arise regarding such rights); and there is a higher likelihood of actual client involvement in the attorney's work in more sophisticated transactions.

Nothing said here approves the actions of the Capoccia firm. Not only is Solomon and Solomon, P.C. free to pursue that firm, but the Debtors here are at liberty to claim-over in this Court against that firm for any damages they or their Chapter 13 estate have suffered in defense of this claim, and to recover same.

SO ORDERED.

---

7. Although she resides in the Buffalo area and the lawsuit was brought in Albany, the complaint could have been mailed to her for signature.

8. See 59 N.Y.Jur.2d, False Imprisonment and Malicious Prosecution § 69 (1987).

## RETAINER AGREEMENT

Christopher C & Diane M. Germain hereby retains and employs the Law Offices of Andrew F. Capoccia, L.L.C. to render all needed and necessary services and to take any and all actions and proceedings necessary which the Law Offices of Andrew F. Capoccia, L.L.C. may deem advisable to settle and compromise in whole or in part certain specified outstanding creditor actions, claims, proceedings, demands and obligations in consideration of which the undersigned hereby agrees to pay the fee of 25% of the total reduction of creditor actions, claims, proceedings, demands and obligations to the Law Offices of Andrew F. Capoccia, L.L.C.

The undersigned agrees to pay a retainer amount of $9212.00 which shall be applied against the fee arrangement. The reducible debt (as set forth in the annexed creditor list) which the Law Offices of Andrew F. Capoccia, L.L.C. is requested to handle, as of the date of this agreement, is $52,639.00.

I(we) agree to pay the entire retainer in advance or, as an alternative, to authorize the Law Offices of Andrew F. Capoccia, L.L.C. to electronically debit my checking account as follows:

4 months at $694.00 dollars plus 16 months at $402.00 dollars

It is understood and agreed that withdrawal may be made from the debt reduction program initiated by the Law Offices of Andrew F. Capoccia, L.L.C. for any reason prior to the completion of the program upon seven (7) days written notice to the Law Office. In the event of withdrawal, there will be a fee equal to that which the Law Offices of Andrew F. Capoccia, L.L.C. would have earned had the indebtedness been paid off at the time of withdrawal.

The undersigned agrees that negotiations for debt reduction are to be conducted solely by the Law Offices of Andrew F. Capoccia, L.L.C. and further understands that negotiations with creditors conducted by either the undersigned, any other person or persons or any entity other than the Law Offices of Andrew F. Capoccia, L.L.C. would be detrimental to the intent of this agreement. The undersigned therefore agrees and warrants not to settle with creditors unless negotiated by the Law Offices of Andrew F. Capoccia, LLC. The undersigned agrees that violation of this provision shall cause a fee to become immediately due and payable to the Law Offices of Andrew F. Capoccia, L.L.C. equal to 17.5% of the reducible debt.

I further agree that if I withdraw from the Debt Reduction Program and retain the Law Offices of Andrew F. Capoccia, LLC. in order to file bankruptcy, my financial responsibility for Debt Reduction will be limited to $25/week for each week I was enrolled in the Debt Reduction program. In addition, I will be responsible for the legal fee in effect at the time I engaged the Law Offices of Andrew F. Capoccia, LLC. to represent me in bankruptcy as well as any government-mandated court fees.

If any payment or electronic transfer is not honored by the bank, a $25.00 service fee shall be paid.

Services rendered which are not usual and customary to debt-reduction will be charged separately. However, any additional services rendered on my behalf must first be authorized by me and the fee for such services must be agreed upon in advance.

It is understood and agreed that representation cannot begin until all requested documents have been provided by me.

/s/Christopher C. Germain

Signature
/s/Diane Germain

Signature
/s/Andrew F. Capoccia

Intake Officer